No. 36,840

The Sinclair Prairie Oil Company and The Landowners Oil Association, *Appellees*, v. A. D. Worcester and Oakie B. Worcester, Husband and Wife, *Appellants;* The Federal Land Bank of Wichita and The Federal Farm Mortgage Corporation, Defendants.

(183 P. 2d 947)

W. K. Skinner, judge. Opinion filed August 12, 1947.

*D. M. McCarthy*, of Hays, argued the cause, and *W. L. Sayers*, of Hill City, and *Kathryn O'Laughlin McCarthy*, of Hays, were with him on the briefs for the appellants.

*R. C. Russell*, of Great Bend, argued the cause, and *Isabel Obee*, of Great Bend, was with him on the briefs for appellee Landowners Oil Association.

*Cecil R. Buckles*, of Tulsa, Okla. argued the cause, and *Edward H. Chandler* and *Roy M. Huff*, both of Tulsa, Okla., were with him on the briefs for appellee Sinclair Prairie Oil Company.

The opinion of the court was delivered by

Harvey, C. J.: The Sinclair Prairie Oil Company, a corporation organized under the laws of Maine, and the Landowners Oil Asso-

ciation, a corporation organized under the laws of Delaware, and both authorized to do business in Kansas, filed a petition against A. D. Worcester and Oakie B. Worcester, his wife, hereinafter called defendants, and the Federal Land Bank of Wichita and Federal Farm Mortgage Corporation, to whom defendants had given mortgages upon the land in controversy. In the petition plaintiffs alleged that they are each owners of mineral operating rights and mineral interests in and to two described quarter sections of land in Graham county; "that said mineral operating rights and mineral interests vested in said plaintiffs arise from and are covered by the terms and provisions of two written instruments": (a) One dated April 24, 1928, executed by Frank E. Washburn and wife, who were then the owners in fee of the real property, to the Landowners Oil Association, and duly recorded; (b) one dated May 22, 1931, executed by the same parties and to the same party and duly recorded; that under the terms and provisions of the two instruments the Landowners Oil Association became the owner of mineral operating rights to produce oil, gas and other minerals from the described real property and an undivided seven-eighths working interest therein "and in addition thereto, was made trustee for the members of the reserved one-eighth ($\frac{1}{8}$) royalty pool, as specified in said instruments, with certain powers in trust, and other rights, as more specifically provided in said instruments," for a term of twenty years from April 24, 1928, and twenty years from May 22, 1931, and as long as gas, oil or other minerals are produced from the land, as more specifically provided in the instruments; that on August 5, 1929, by two written instruments, the Landowners Oil Association transferred and assigned to Central Royalty Company an undivided half of all its mineral operating rights upon the real property, and in addition thereto an undivided one-half of the one-eighth reserved royalty for which it was trustee for the pool members, which instruments are duly recorded; that on October 1, 1936, the Central Royalty Company assigned and transferred to the Sinclair Prairie Oil Company all its right, title and interest assigned to it by the two instruments above mentioned, which instrument of October 1st was duly filed for record, and that on February 16, 1942, the Landowners Oil Association executed to the Sinclair Prairie Oil Company an assignment and conveyance confirming its instruments of August 5, 1929, to the Central Royalty Company so that the Sinclair Prairie Oil Company should be entitled to have and hold the

rights conveyed to it by the Central Royalty Company during the full term provided by the instrument of May 22, 1931, which instrument was duly recorded. Copies of these instruments were attached to and made a part of the amended petition as Exhibits "A," "B," "C," "D," "E" and "F," and will be so referred to hereafter.

It further alleged that now and before August 2, 1940, defendants were the owners of record of the real property previously described, subject to the rights of the plaintiffs, on which date the county clerk of Graham county executed and delivered to A. D. Worcester a tax deed covering both tracts of land, which tax deed was recorded November 13, 1942; that the same was issued by the clerk pursuant to a purported sale of the oil, gas and other minerals in and under the land for default in payment of the taxes for the years 1933, 1934, 1937 and 1938, attempted to be assessed upon the mineral interests in the land. It was alleged that the tax deed was void and should be cancelled as a cloud upon the mineral operating rights, mineral titles and mineral interests in the property vested in the plaintiffs for the reason, (a) that the rights of the plaintiffs acquired under the instruments previously mentioned were not legally subject to taxation as they did not constitute a severance of ownership of the oil, gas and other minerals separate from the ownership of the surface of the lands, as contemplated by G. S. 1935, 79-420; (b) that the tax deed is void and nonenforceable because it purports to convey entire title to the land described without excepting and excluding therefrom the mineral operating rights and mineral claims vested in the plaintiffs; (c) that it is also void because it was not filed of record within the time provided by G. S. 1935, 79-2512 and 79-2514; and (d) that it was also void because the proceedings upon which the same is based were not in accordance with the laws of the state.

It was alleged that on November 1, 1934, the defendants executed a mortgage to the Federal Land Bank of Wichita covering both tracts of land, which mortgage was duly filed for record, and on the same date executed a mortgage to the Land Bank Commissioner, which is now owned by the Federal Farm Mortgage Corporation, which mortgage was duly recorded, and that although each of the mortgages described the land without exempting therefrom the mineral operating rights, mineral titles and mineral interests therein owned by plaintiffs and of record they are subsequent and inferior

thereto, and that such mortgages constitute clouds upon the mineral operating rights, interests and privileges vested in plaintiffs by the instruments previously mentioned.

The prayer was that the tax deed be adjudged and decreed to be void and that the mortgages be declared invalid and nonenforceable as against the interests and mineral operating rights of plaintiffs, and "that the said interests and mineral operating rights of said plaintiffs be quieted in said plaintiffs as against any of the claims of each and all of said defendants, and any and all persons claiming by, through or under either or all of said defendants adverse to the interests and mineral operating rights of said plaintiffs in the real property first herein described."

Defendants filed an answer to the petition which need not be detailed for the reason that the trial court sustained plaintiffs' demurrer thereto, giving defendants leave to file an amended answer, which was done. The amended answer contained a general demurrer to plaintiffs' petition. It also contained what was pleaded as separate defenses. The plaintiffs moved to strike each of the separate defenses on the ground that they respectively did not constitute answers to the plaintiffs' petition.

On November 2, 1946, defendants' demurrer to plaintiffs' petition was presented to, considered and overruled by the court, and plaintiffs' motion to strike the separate defenses of defendants' answer was treated as a demurrer to such separate defenses and was considered by the court and sustained, and the court rendered a decree holding "that the tax deed issued to the defendant, A. D. Worcester, is void and of no force and effect as against the plaintiffs and it is invalid and nonenforceable as against the interests and mineral operating rights of said plaintiffs and each of them, and that said interests and mineral operating rights of the plaintiffs are quieted in said plaintiffs as against any and all claims of said defendants, A. D. Worcester and Oakie B. Worcester, and any and all persons claiming by, through or under either or both of said defendants adverse to the interests and mineral operating rights of said plaintiffs in the real property the subject of this action, and said plaintiffs are given and granted their costs herein, for which let execution issue.".

Defendants have appealed and present many assignments of error. In the natural order of treating them the first to be considered is their contention that the court erred in overruling their de-

murrer to plaintiffs' petition as amended. We will refer to the parties as they appeared in the trial court.

Plaintiffs' action is in equity to remove clouds (the tax deed, the mortgages given by defendants, and their claim to full ownership of the property) upon the rights of plaintiffs and to quiet in them their interests and mineral operating rights. These are variously described in the petition as "mineral operating rights," "mineral operating rights, mineral titles and mineral estates owned by these plaintiffs," "mineral operating rights, mineral titles and mineral interests then owned by these plaintiffs," "the mineral operating rights, mineral interests and mineral estates vested in said plaintiffs in and to the real property first herein described," "mineral operating rights, mineral titles and mineral interests in said real property vested in said plaintiffs," "mineral operating rights, interests and privileges vested in said plaintiffs," "rights and privileges vested in said plaintiffs concerning the mineral interests in said land," "their rights and interests in said realty," "interests and mineral operating rights of said plaintiffs," "interests and mineral operating rights of said plaintiffs in the real property first herein described." Irrespective of how they may be characterized, it is clear that all of the rights plaintiffs claim arise from and are governed by the terms of the written instruments, copies of which are attached to the petition. They are set out and described in the appendix to this opinion and will be referred to herein by the exhibit number. While plaintiffs claim under all of the exhibits, they rely chiefly on Exhibits "A" and "B," since they are the only ones signed by the owners of the land, although in point of time of execution Exhibits "C" and "D" are between them. Exhibits "C," "D," "E" and "F" disclose interpretations by plaintiffs of the rights acquired by them under Exhibits "A" and "B." Each of them bears a title appropriate to a conveyance of minerals in place, and Exhibits "C," "D" and "F" purport to convey, in addition to other rights, "an undivided one-half interest in and to all the minerals, including oil and gas, in and under and/or that may be produced from said tract of land above described, together with the right of ingress and egress at all times for the purpose of mining, drilling and exploring said lands for such minerals and removing the same." And Exhibit "E" contains language which might be construed to have the same effect. We note that Exhibits "B," "C" and "D" were not filed for record within ninety days after they were ex-

ecuted, and it is not contended they were listed for taxation; hence "C" and "D" are void under G. S. 1935, 79-420, and Exhibit "B" is void for the same reason if it authorized the grantee to convey minerals in place, as plaintiffs have interpreted it in Exhibits "C," "D" and "F."

Exhibit "A" was dated April 4, 1928, and duly recorded May 10, 1928. It carried the somewhat ambiguous title, "Oil and Gas Conveyance (Entire Interest)." Frank E. Washburn and wife, who warranted the title (par. 19), were designated ".grantor" and the Landowners Oil Association was designated "grantee." It recited a consideration of one dollar paid and "the covenants and agreements hereinafter contained, on the part of the *grantor* and grantee to be fulfilled." By its terms the grantor "granted, demised, leased and let" to the grantee "the exclusive right" to explore, mine and produce mineral products and other minerals and to build structures thereon, "to produce, save and take care of and manufacture all of such substances," with rights of way for pipe lines, telephone and telegraph lines, with the right to remove the same on a described tract of land containing 640 acres, which included the 320 acres described in the petition, for a term of twenty years, and longer if minerals were being produced or if drilling operations were being prosecuted (par. 23). It specifically provided (par. 15): "The drilling of a well or sinking a shaft for oil, gas or other mineral is not necessary for the continuance of the life of this conveyance," and it contained no provision requiring the grantee to pay any sum, annually or otherwise, for delay in drilling.

We find no other covenant or agreement in the instrument which constituted a consideration moving to the "grantor." On that point plaintiffs stress paragraph 1 of the mutual agreements in which "the grantee agrees that it will place the land above described in an acreage pool," said to consist of more than 25,000 acres and would not exceed 500,000 acres, selected by the grantee and at its expense upon similar conveyances. Clearly this was an obligation which the grantee assumed to perform. The paragraph contained the following: "And it is mutually agreed between the parties hereto that the obligations herein assumed by the grantee are a valuable and sufficient consideration for this conveyance and the covenants and agreements of the grantor." We think this cannot be regarded as a consideration moving to the grantor for the reasons: *First,* that there is no allegation in the petition that the agreement of the

grantee was ever performed. *Second,* this paragraph did not make the "grantor" a member of the "acreage pool." Indeed, that term is not defined in the instrument. It does not state what interests the grantor would have in the acreage pool, if it had been or was to be formed. It does not provide for the issuance of a certificate to him stating his membership and outlining his interests therein, nor does it provide for a list of the lands in such pools to be furnished the grantor. There is no allegation in the petition that any of those things was done. *Third,* if the grantee performed the agreement and made its own selection of lands, at its own expense, it did so for its own benefit, as shown by subsequent provisions of the instrument (pars. 2 and 8) and the subsequent instruments executed (Exhibits "C," "D" and "F") and not for the benefit of the grantor. This could not constitute a benefit moving to the grantor.

In *Sharpless v. J. B. Kirk Gas & Smelting Co.,* 128 Kan. 722, 280 Pac. 788, which involved a promise to make an option contract for the sale of gas properties for a stated amount, in which the purchaser agreed to furnish at his own expense engineers to inspect, investigate and appraise the gas properties, such a promise was held not to constitute a consideration to the seller for the reason that such expense was for the benefit of the purchaser. In *Shelden v. Bright,* 135 Kan. 361, 10 P. 2d 831, there was involved a contract for the sale of the oil, gas and other minerals under a described tract of land, the title to which proved to be unmarketable. The parties orally agreed that the seller would undertake to have the titles made marketable within ninety days, and the purchaser agreed to have his attorney examine the titles as soon as the abstracts were completed. In an action by the purchaser to enforce the agreement it was argued that his agreement to go to the expense of having his attorney examine the abstracts constituted a consideration for the contract. The court denied that contention upon the ground that the services which would be performed by the buyer's attorney would be for the buyer's benefit.

In *Brinkman v. Empire Gas and Fuel Co.,* 120 Kan. 602, 245 Pac. 107, in which a senior lessee was suing a junior lessee and a part of the consideration stated in the senior lease consisted of commencing a test well within the county within a year, the promise of the grantee to deliver a portion of the oil realized from the grantor's land or pay the market price for it, a promise to deliver gas for

domestic purposes if found on the premises, and a promise to pay a sum per year for gas marketed, was held not to constitute a consideration where the grantee did not promise to commence a test well in the county or to make any effort to realize oil or find or market gas from the land, and there was no detriment to the grantee if he failed to do any of those things.

If defendants' land described in the petition was ever placed in the acreage pool mentioned in paragraph 1 of the instrument it was effectively taken out by the grantee, presumed to be acting under the last sentence of paragraph 2 of the instrument, when it executed Exhibits "C" and "D" by which it assigned and conveyed unto Central Royalty Company one-half of the royalty interest reserved by the instrument and by Exhibit "F" when it conveyed the other one-half of such royalty interest reserved to the Sinclair Prairie Oil Company.

By paragraph 2 the grantee was given the privilege of assigning the whole or any part of "this estate." We construe the quoted words as limited to the exclusive right of the grantee to explore and produce minerals, etc., from the land, previously granted in the instrument, and not as including any part of the land itself or of the minerals in place in the land. It further provides that in making such an assignment "the grantee will reserve" to the members of the pool one-eighth of the minerals produced, or their value if sold. It further authorizes the grantee to "sell and assign said royalty interest reserved herein," the proceeds of the sale to go to the acreage pool. We interpret this to refer to the one-eighth of the minerals produced, or their value, which the grantee agreed to "reserve" to the members of the pool in the event he assigned the whole or any part of the estate. Nowhere in this paragraph, nor in any other portion of the instrument, do we find any authority for the grantee to sell the land itself, or the minerals in place in the land, as he attempted to do in Exhibits "C," "D" and "F."

In the petition it was alleged that by Exhibits "A" and "B" the grantee became the owner of the mineral operating rights and an undivided seven-eighths of the minerals produced, "and in addition thereto was made trustee for the members of the reserved one-eighth (1/8) royalty pool, as specified in said instruments, with certain powers in trust, and other rights, as more specifically provided in said instruments." We find nothing in the instruments to justify that allegation. The only trustee named was S. M. Jaggar, and

the trust imposed in him was to receive moneys deposited in the bank to his credit by the grantee or its assigns and to pay the money out, as provided in paragraph 9. He had nothing to do with the management of the property or its operation.

While in a few cases (*Brinkman v. Empire Gas and Fuel Co.*, 120 Kan. 602, syl. ¶ 3, 245 Pac. 107) it has been said under the circumstances that one dollar is a sufficient consideration for an oil and gas lease or an option to produce, the overwhelming weight of authority is that the real basic consideration for such an instrument is the development of the land for the production of petroleum products. (*Mills v. Hartz*, 77 Kan. 218, 94 Pac. 142; *Howerton v. Gas Co.*, 81 Kan. 553, 106 Pac. 47; *Myers v. Shell Petroleum Corp.*, 153 Kan. 287, 110 P. 2d 810.) This is precluded by paragraph 15 of the instrument.

The petition alleges that on or before August 2, 1940, defendants were the owners of the land described "subject to the rights, interests and estates of said plaintiffs." The petition does not allege the date defendants acquired ownership of the land, but it must have been as early as November 1, 1934, when it is alleged that defendants executed mortgages thereon. It is not alleged that the instrument by which defendants acquired title to the property recited that the conveyance was subject to Exhibits "A" and "B" or made any statement with reference thereto. In this court it is asserted by defendants that they acquired title to the property from Frank E. Washburn and wife by a general warranty deed, which had no exceptions or reservations therein, and this statement is not controverted by the plaintiffs; and the present claim of defendants is not negatived by the petition, hence the language above quoted from the petition is construed to refer to the fact that Exhibits "A" and "B" were of record at the time defendants acquired title to the property. It was alleged that the tax deed was issued by the county clerk "pursuant to a purported sale of the oil, gas and other minerals in and under said lands, for default in the payment of taxes for the years 1933, 1934, 1937 and 1938 attempted to be assessed upon mineral interests in said lands." It was further alleged "that said tax deed is void and nonenforceable because it purports to convey the entire title to the lands described therein, without excepting and excluding therefrom the mineral operating rights and mineral claims vested in said plaintiffs herein." This last allegation would tend to indicate that the tax deed was issued upon the failure of defendants to pay the tax upon the prop-

erty, as described by the deed to them. But whatever taxes were delinquent, and without regard to whether the tax levies were void or valid, defendants had a right to purchase the tax deed if for no other reason than to keep someone else from purchasing it and causing litigation. In short, they had a right to purchase their peace. And if, as now contended by plaintiffs, the instruments under which they claimed gave them no title to the minerals in place, or to the land itself, it is immaterial to them whether defendants acquired title to the land by a deed from Washburn and wife or by a tax deed.

Plaintiff should bring his petition upon a distinct and definite theory. (See *Grentner v. Fahrenschield,* 64 Kan. 764, 68 Pac. 619, which has been repeatedly cited with approval. Also see *Lofland v. Croman,* 152 Kan. 312, 103 P. 2d 772, and many cases cited, p. 316.) Here the general statement in the petition of the rights claimed by plaintiffs under Exhibit "A" and the subsequent exhibits disclosing how the plaintiffs had interpreted that instrument are so indefinite that it is difficult to determine and describe the rights claimed by plaintiffs. If the judgment appealed from should stand, litigation is almost sure to follow in order to particularize the specific rights claimed by the plaintiffs.

Exhibit "B" is identical with Exhibit "A" except as noted in the appendix hereto. Perhaps the change of the bank in which the deposits were to be made to the trustee is not particularly important. However, the authority of the grantee to name another trustee in the event of a vacancy is important in that then the pool in which defendant's property would be placed would include other lands and other persons, which at best would complicate the matter of distribution. We observe that the question of what shall be done with royalties or royalty money, so far as either Exhibit "A" or Exhibit "B" is concerned, is but little more than a discussion about something that never has come into existence. In the more than eighteen years since the execution of Exhibit "A" there has been no production on this land or any attempt to produce any minerals thereon. Exhibit "B," if it formed a basis for the grantee therein to execute Exhibit "F," is void under G. S. 1935, 79-420. As indicating an uncertainty of the plaintiffs respecting the interpretation of instruments "A" and "B" we note that while the parties in those instruments are called "grantor" and "grantee," when they are referred to in the later instruments they are called "lessors" and "lessee." This tends to indicate either that the grantee in Exhibits "A" and "B" was uncertain

of his status or of his rights under those exhibits, or that for some reason it desired to change its status and rights. Neither the defendants nor Washburn and wife were parties to those subsequent exhibits, hence are not bound by the designation of their status as made therein.

To be valid mutual agreements must embody a common intention. In 17 C. J. S. 359, § 31, the rule is thus stated:

"A common intention, a meeting of the minds, on all the terms thereof, is essential to an agreement, and no portion of the terms may be left unsettled."

Considering Exhibit "A" and the indefinite claim made by plaintiffs in their petition and their interpretation of the grantee's rights therein, as disclosed by the subsequent exhibits, it seems clear that there was no definite meeting of the minds of the parties; that the grantor, by reading Exhibit "A," could not have understood the claims now made and the interpretation the grantee has placed upon the instrument. Certainly many of these things were left unsettled by the terms of the instrument. The rule is supported by many authorities.

It is unlikely this action was brought because of the tax deed, for if, as plaintiffs claim here, Exhibit "A" gave them no title to the minerals in place they have no concern respecting this tax deed. And if, as some of the claims of mineral rights and titles indefinitely stated in the petition, and some of the provisions inserted in the subsequent exhibits, would justify them in claiming title to minerals in place, the tax deed is void as an instrument of title for the reason that it was not filed of record within the time required by our statute (G. S. 1935, 79-2112; 79-2514). Hence the tax deed is an inconsequential thing to have a lawsuit about. Reading the petition and the exhibits, it seems clear that the real purpose of this action was to have the indefinite claims made in the petition respecting Exhibit "A," as the same are interpreted by plaintiffs in the subsequent exhibits, judicially confirmed and approved by the decree of a court of equity.

One who comes into a court of equity seeking the establishment of rights under a contract is not entitled to a favorable decree as a matter of course. He is bound by the general maxims of equity discussed in 30 C. J. S. 454 et seq. The court examines the contract as a whole and endeavors to reach an equitable result. Normally the court does not consider the quantum of the consideration where it is fairly and intelligently agreed upon; yet, if upon the consid-

eration of the entire agreement, the named consideration is obviously inadequate, the court may decline to give the relief sought, and should do so if the result is obviously unjust. The rule is well stated by the American Law Institute in Restatement of the Law, Contracts, p. 367, as follows:

"Specific enforcement of a contract may be refused if (a) the consideration for it is grossly inadequate or its terms are otherwise unfair, or (b) its enforcement will cause unreasonable or disproportionate hardship or loss to the defendant or to third persons, or (c) it was induced by some sharp practice, misrepresentation, or mistake."

In this case we find the only consideration to the grantor was the one dollar paid at the time of the execution of the agreement, yet the decree sought is highly beneficial to the grantee and seriously detrimental to the grantor. There are many authorities supporting the rule last stated. Among them are our own cases. (See *Young v. Schwint*, 108 Kan. 425, 195 Pac. 614; *Milling Co. v. Waite*, 112 Kan. 809, syl. ¶ 3, 213 Pac. 160; *Haston v. Citizens State Bank*, 132 Kan. 767, syl. ¶ 3, 297 Pac. 1061, and the authorities cited in those cases.)

Upon the construction to be given to Exhibits "A" and "B" the plaintiffs in this court cite and rely heavily upon *Moos v. Landowners Oil Ass'n*, 136 Kan. 424, 15 P. 2d 1073; *Beltz v. Griggs*, 137 Kan. 429, 20 P. 2d 510, and *Eichman v. Landowners Oil Ass'n*, 153 Kan. 791, 113 P. 2d 1056. In the Moos case the owner of a tract of land had executed a deed to the grantee of an undivided one-half of all oil, gas and other minerals in and under the real property described. He brought an action to cancel it upon the ground that the instrument was a speculative security within the meaning of our statute (G. S. 1935, 17-1201 *et seq.*), and that the grantee had not procured authority to deal in such instruments. In the meantime the grantee had sold for a valuable consideration one-half of the interest it had acquired by the mineral deed. Much of the opinion went to the question as to whether the instrument was a speculative security requiring a permit under the statute. The court held in favor of plaintiff on that point and set aside the instrument so far as the interest therein retained by the grantee was concerned; but upon a showing in the record that the purchaser from the grantee had paid a valuable consideration and acted in good faith, and of the high financial standing of the grantee, the court refused to set aside the interest of the purchaser from the grantee, and in doing so the court

discussed the authority of the grantee to convey a part of its interest. In *Ward v. Home Royalty Ass'n,* 142 Kan. 546, 50 P. 2d 992, an action by the owner of the real property to set aside a mineral conveyance, similar to the one in the Moos case, to an Oklahoma common law trust, this court sustained a judgment of the trial court setting aside the instrument. The Moos case had been cited in support of the instrument and this court in the opinion (p. 549) said:

"In different forms, schemes such as that embodied in the declaration of trust have been before this court in several cases. The court has declined to hold such schemes to be intrinsically fraudulent (*Moos v. Landowners Oil Ass'n,* 136 Kan. 424, 15 P. 2d 1073; *Beltz v. Griggs,* 137 Kan. 429, 20 P. 2d 510), but the legislature and the court have recognized that prosecution of such schemes is all too likely to be attended with overreaching and fraud.

"In the Moos case just cited it was urged that because the promoters have absolute power to sell as if individual owners, they might make a sale to a confederate just before a 'gusher' was brought in. In that event, all the grantors would get would be proportionate parts of income augmented by the sale price, in case of distribution of profits. The sellers would get the enormous proceeds of production. In the Moos case the association was a corporation with an apparently sound capital structure. Some of the results of operation were frankly disclosed, and the court declined to assume fraud would be practiced. *The court did not foresee the extent to which such schemes would be promoted in Kansas, and did not take into account the practical helplessness of a Kansas farmer if compelled to resort to litigation to correct abuses in corporate or trust management."* (Emphasis supplied.)

In the Moos case the court did not have before it the indefinite language of plaintiffs' claim nor the action taken by the grantee in Exhibit "A" in the later exhibits. In the Beltz case the court followed in the main its holding in the Moos case, where an instrument executed to a common law trust was involved, the question there being whether the lack of a permit under the statute barred the innocent purchaser of a part of the interest conveyed to the common law trust where there was a valuable consideration. The Eichman case followed the Moos case and held the instrument then under consideration was not unconscionably and intrinsically fraudulent, and sales by the grantee to innocent purchasers for substantial consideration were sustained.

The Moos, Beltz and Eichman cases do not constitute authority for the plaintiffs to maintain this action. In them the court dealt only with the questions before it, and without unduly criticizing the court it may be said that the court went to great lengths in order to sustain what under the facts of those cases disclosed to be

the rights of innocent purchasers for substantial value. Even in doing so the court in the Ward case recognized that what was said in the Moos case about the authority of the grantee might be unjustly used to annoy the owners of farm land by extensive litigation. We find an example of that here, where plaintiffs claim indefinite rights and privileges and where they actually interpreted the basic instruments to authorize the grantee therein to convey minerals in place, not for a substantial, adequate consideration, but in each instance for the nominal consideration of one dollar.

In their brief here plaintiffs point out that the defendants were not the original parties to Exhibits "A" and "B," but acquired the title from the grantors in those instruments and contend that defendants, therefore, have no right to attack the instruments for lack of consideration or mutuality of obligation. The point is not well taken. Paragraph 25 allows to either party the right to assign his interests and provides that the "covenants hereof shall extend to the heirs, executors, administrators, successors and assigns," and the next paragraph extends the terms of the instruments to the same parties. We think there is no lack of authority for the defendants to question the provisions of the instruments. Certainly they have as much right to do so as the Sinclair Prairie Oil Company has to appear as plaintiff herein.

Plaintiffs in their brief here point out that neither the defendants nor Washburn, the original grantor, has ever brought any action to have Exhibits "A" and "B" set aside. We think that fact does not preclude defendants from raising the questions here considered. The grantee in those instruments had never disturbed plaintiffs' occupation or possession of the property by attempting to develop it for petroleum or other minerals. This is the action of the grantee and its assignee. They must prevail upon the strength of their own allegations respecting their rights and not upon the weakness of defendants.

Some other questions are discussed, but in the view we take of the case it will not be necessary to consider them, and this opinion will not be an indication that we express any view thereon.

The result is that the judgment of the court below should be reversed with directions to sustain defendants' demurrer to plaintiffs' amended petition. It is so ordered.

WEDELL, J., concurs in the result.

HOCH, J., not participating.

# APPENDIX

## EXHIBIT "A"

### OIL AND GAS CONVEYANCE

#### (ENTIRE INTEREST)

THIS AGREEMENT, made this 24th day of April, in the year Nineteen Hundred and Twenty-eight by and between Frank E. Washburn and Rosa Washburn his wife, of Hill City, Kansas, hereinafter called the grantor (whether one or more), and the LANDOWNERS OIL ASSOCIATION, a corporation existing under the laws of the State of Delaware, whose existence for all purposes is hereby admitted, hereinafter called the grantee;

WITNESSETH, that the grantor, for and in consideration of the sum of One Dollar ($1.00) in hand paid, receipt of which is hereby acknowledged, and of the covenants and agreements hereinafter contained, on the part of the grantor and grantee to be fulfilled, kept, and performed, has granted, demised, leased and let, and by these presents does grant, demise, lease and let, unto said grantee, its successors and assigns, with the exclusive right to prospect, explore, by use of core-drills or otherwise, to mine, operate, produce, store and remove therefrom oil, gas, casinghead gas, and all petroleum products, and all other minerals; and to build tanks, power houses, such other houses necessary for convenience of employees, stations, and structures thereon to produce, save and take care of and manufacture all of such substances, together with rights of way, easements and servitude for pipe-lines, telephones, and telegraph lines, with the right for such purposes to the free use of oil, gas, or water from said land, but not from grantor's water wells or ponds, with the right of removing, either during, or after the term hereof, all and any improvements placed or erected on the premises by the grantee, including the right to pull all casing, all that certain tract of land situated in the County of Graham, State of Kansas, described as follows, to-wit: South East Quarter (SE ¼ Section 14 160 A & South half of South West Quarter (S ½ SW ¼) Sec. 14 80 A & North East Quarter of S West Quarter (NE ¼ of SW, ¼) Sec. 14 40 A & South East Quarter of N West Quarter (SE ¼ of NW ¼) Sec. 14 40 A & North East Quarter and South West Quarter (NE ¼ & SW ¼) Sec. 23—320 A of Section all in, Township 7 S., Range R 22 W, and containing 640 acres, more or less.

To HAVE AND TO HOLD the same for the term of Twenty (20), years from this date, and as long thereafter as any oil or gas or casinghead gas, or any mineral, is produced therefrom, or as much longer thereafter as the grantee, its successors or assigns, in good faith shall conduct development or producing operations thereon, and should production result from such operations, this conveyance shall remain in full force and effect as long as oil or casinghead gas or any mineral shall be produced therefrom.

In consideration of the premises, it is hereby mutually agreed as follows:

1. The grantee agrees that it will place the land above described in an acreage pool, known as "Pool 1," which now consists of more than twenty-five thousand acres and shall not exceed five hundred thousand acres, having been and

to be selected according to the judgment and at the expense of the grantee, said pool to be assembled on similar conveyances except as to duration of term; and it is mutually agreed between the parties hereto that the obligations herein assumed by the grantee are a valuable and sufficient consideration for this conveyance and the covenants and agreements of the grantor.

2. The privilege of assigning the whole or any part of this estate is hereby expressly allowed to the grantee, with the understanding that the grantee will reserve to the collective credit of the members of said pool, as royalty, free of cost, one-eighth of all oil, or gas, or other mineral produced and saved from said land, or, in the discretion of the grantee, a sum of money equal to the value of said royalty at the prevailing local posted market price for oil or other mineral of like quality the day it is run into pipelines or storage, or sold. The grantee may sell and assign said royalty interest reserved herein, and the proceeds therefrom shall inure to the benefit of the acreage pool.

3. Should the grantee drill or mine the premises and produce oil, or other mineral, it shall deliver to the collective credit of the members of said pool, as royalty, free of cost, in the pipeline to which it may connect its wells, one-eighth of all oil produced and saved from the premises, or, at the grantee's option, place to the credit of the members of the pool the equivalent in money for such royalty at the local posted market price prevailing for oil or other mineral of like quality the day the oil or other mineral is run into pipelines, or storage, or sold.

4. If the said grantee drills the premises, it shall pay to the credit of the members of the pool, or, if it assigns this estate, shall reserve to their credit, as royalty, one-eighth of the local market value of gas from each well where gas only is found while the same is being sold or used off the premises.

5. The grantee shall place to the credit of the members of the pool, or, in the event of assignment, reserve to their credit, for gas produced from any oil well and used by the grantee or its assigns for the manufacture of gasoline, as royalty, one-eighth of the market value of such gas at mouth of well. If said gas is sold by the grantee or its assigns, the members of said pool shall receive as royalty one-eighth of the market value of such gas in the field.

6. Should other minerals be produced from the premises aforesaid, the grantee shall place to the credit of the members of said pool, or, in the event of assignment, reserve to their credit, one-eighth of the local market value of such mineral.

7. That all royalty oil or other royalty mineral or royalty money, and all rental and bonus money, as herein provided, shall be the collective property of the grantee, and all of the members of the acreage pool referred to in Paragraph One, hereof, and that said money will be deposited to the credit of S. M. Jaggar, as trustee or to his successor trustee at the time being, in the Citizens State Bank, of Russell Springs, Kansas.

8. That the grantee, in consideration of the formation and management of the pool shall receive twenty-five percent of all incomes as herein provided, including bonuses, rentals and royalties.

9. That the trustee aforesaid shall, not less often than quarterly, make distribution of the money held by it as trustee in the following manner, to wit:

556

(a) That from said fund shall first be deducted and paid to the grantee the twenty-five percentum aforesaid for its services.

(b) That next shall be deducted and paid the reasonable expenses of banking and trusteeship.

(c) That the balance then remaining shall be distributed among and paid to the several members of the pool as follows: That each member of the pool shall be entitled to the share in the balance at each periodical distribution in the proportion that the number of acres he has conveyed to the pool bears to the actual number of acres comprising said acreage pool.

10. All payments which may fall due under this conveyance may be made to Frank E. Washburn, one of the above named grantors, in the manner herein stated, and whose receipt of such payment shall be a full discharge of the grantee.

11. In case said grantor owns a less interest in the above described land than the entire and undivided Fee simple estate therein, then the interest of the said grantor in his share of the income of the pool shall be only in the proportion which his interest bears to the whole and undivided fee.

12. If said premises shall hereafter be owned in severalty or in separate tracts, the premises, nevertheless, shall be treated as one tract, and all income accruing hereunder shall be treated as an entirety, and the interest of each separate owner in the income of the pool shall be in the proportion that the acreage owned by each separate owner bears to the entire acreage granted in this conveyance.

13. The grantee shall not be liable for any defect in, or failure to discover any defect in, the title to any land in said pool, nor for any act, failure, or omission on the part of any member of the pool.

14. For the purposes of this conveyance, a closed gas well shall be deemed and held to be a producing well.

15. The drilling of a well or sinking a shaft for oil, gas or other mineral is not necessary for the continuance of the life of this conveyance.

16. The grantor shall have gas free of charge from any gas well on the said premises for all stoves and inside lights in the principal dwelling house on said land by making his own connections with the well, the use of said gas to be at the grantor's sole risk and expense at all times.

17. When required by the grantor, the grantee or its assigns shall bury pipelines below plough depth and shall pay for damage caused by its operations to growing crops on said land.

18. No well shall be drilled nearer than two hundred feet to the house or barn now on said premises without written consent of the grantor.

19. The grantor hereby warrants and agrees to defend the title to the land herein described.

20. If the title of the grantor shall not be good of record and in fact, the grantee, at its election, may declare this agreement cancelled, and thereupon it shall be released from all the obligations thereof to the grantor.

21. At the demand of the grantee, any taxes, mortgages, or other liens against said land shall be paid by the trustee first from any income accruing to the grantor.

22. The grantee shall have the right at any time to redeem for the grantor,

by payment, any mortgage or mortgages, taxes, or other liens on the above described lands, in the event of default of payment by grantor, and upon such payment shall be subrogated to all the rights of the holders thereof.

23. Notwithstanding anything in this conveyance contained to the contrary, it is expressly agreed that if the grantee or its assigns shall commence drilling operations at any time while this conveyance is in force, this conveyance shall remain in force and its term shall continue so long as such operations are prosecuted, and, if production results therefrom, then so long as such production continues.

24. It is agreed that this conveyance shall never be forfeited or cancelled for failure to perform in whole or in part any of its implied covenants, conditions, or stipulations until it shall have first been finally judicially determined that such failure exists, and after such final determination, the grantee or its assigns is given a reasonable time therefrom to comply with any such covenants, conditions or stipulations.

25. If the estate of either party hereto is assigned (and the privilege of assigning in whole or in part is expressly allowed), the covenants hereof shall extend to the heirs, executors, administrators, successors and assigns.

26. This conveyance and all of its terms, conditions, and stipulations shall extend to and be binding upon, and inure to the benefit of all the heirs, executors, administrators, and assigns of said grantor, and the successors and assigns of the grantee.

27. The grantors agree to and with the grantee, its successors and assigns, that they have read and are informed of the contents of this instrument, and that there are no agreements or representations inducing the execution of this conveyance other than what is printed and written hereon.

IN TESTIMONY WHEREOF, we sign this instrument the day and year first above written.

(This instrument was duly executed by the parties and duly filed for record May 10, 1928.)

## EXHIBIT "C"

### TERM MINERAL DEED AND OIL GAS LEASE

AGREEMENT made and entered into this 5th day of August, 1929, by and between the Landowners Oil Association, hereinafter called Lessee, and Central Royalty Company, hereinafter called Assignee, and J. A. Hull Company, hereinafter called Sublessee, all of said parties being Delaware corporations, WITNESSETH:

WHEREAS, on the 24th day of April, 1928, a certain mining lease, hereinafter called original lease, was made and entered into by and between Frank E. Washburn and Rosa Washburn his wife of Hill City, Kansas, hereinafter called Lessors, whether one or more in said original lease, and said Lessee, covering the following described tract of land in the County of Graham and State of Kansas, to wit: Northeast Quarter (NE ¼) of Section 23, Township 7 South, Range 22 West, being 160 acres more or less, and other lands not affected hereby, said lease being recorded in the office of the Register of Deeds

in and for said County in Book 4, at Page 51; which said lease empowered Lessee to sell and assign the royalty interests in the minerals thereby created and reserved to Lessors, the proceeds therefrom to inure to the benefit of an acreage pool known as Pool Number One, formed with said lease and other like leases, thereby authorized, payable through a Trustee therein and hereinafter named.

AND WHEREAS, the said lease and all rights thereunder, or incident thereto, are now owned by Lessee, subject to a contract of sale by Lessee to Assignee, and Sublessee, whereby Lessee has sold to Assignee an undivided one-half interest in all the rights of both Lessors and Lessee, created by said original lease, and has also subleased to sublessee, Lessee's remaining undivided one-half interest in said lease for oil and gas mining purposes for the term and under the conditions hereinafter stated, and Assignee has made a like sublease to Sublessee, all to be evidenced hereby.

Now, THEREFORE, in consideration of One Dollar, and other good and valuable considerations, jointly paid by Assignee and Sublessee to the Trustee of such pool, named in said lease, the receipt of which is hereby acknowledged, said Landowners Oil Association, Lessee, in its own right as well as in execution of the powers in trust, expressed and implied in said lease, does hereby bargain, sell, transfer, assign and convey unto Central Royalty Company, Assignee, an undivided one-half of all the one-eighth royalty and royalty interests reserved, created and authorized by said original lease, the same to be paid to and/or kept by Assignee, its successors or assigns, directly, without the intervention and free from all claims of Lessors, Lessee, such pool members and/or such Trustees; together with and in addition thereto an undivided one-half of all of the Lessee's rights granted and created by said original lease, known as the working interest, except Lessee's powers in trust and right to future compensation for services thereby provided for; it being the intention hereby to convey, and Landowners Oil Association, Lessee, does hereby convey to Central Royalty Company, Assignee, an undivided one-half interest in and to all the minerals, including oil and gas, in and under and/or that may be produced from said tract of land above described, together with the right of ingress and egress at all times for the purpose of mining, drilling and exploring said lands for such minerals and removing the same therefrom as a tenant-in-common of such one-half thereof, for the unexpired part of the twenty year term and extensions thereof provided in said original lease, free from the payment of any royalty.

ALSO said Landowners Oil Association, Lessee, in its own right as well as in execution of the powers in trust, expressed and implied in said original lease, for the same consideration; and said Central Royalty Company, Assignee, for and in consideration of one dollar, cash in hand paid and other good and valuable considerations, the receipt of which is hereby acknowledged; each severally and as tenants-in-common, and as Sublessors, under said original lease for and in further consideration of the covenants and agreements, hereinafter contained, on the part of J. A. Hull Company, Sublessee, to be fulfilled, kept and performed to them respectively, by these presents does grant, demise, lease and let unto said J. A. Hull Company, Sub-

lessee, its successors and assigns, with the exclusive right to prospect, explore, by use of core-drills or otherwise, to mine, operate, produce, store, and remove therefrom oil, gas, casinghead gas, and all petroleum products; and to build tanks, power houses, such other houses necessary for convenience of employees, stations and structures thereon to produce, save and take care of and manufacture all of such substances, together with rights of way, easements and servitudes for pipelines, telephones, and telegraph lines, with the right for such purposes to the free use of oil, gas, or water from said land, but not from Lessor's water wells or ponds, with the right of removing, either during or after the term hereof, any or all improvements placed or erected on the premises by Sublessee, its successors or assigns, including the right to pull all casing from wells, their respective undivided one-half of and interest in and to said tract of land, above described, to have and to hold the same for the term of ten years from the date hereof, and as long thereafter as any oil, gas, casinghead gas or any like mineral is produced therefrom, and as much longer thereafter as the Sublessee, its successors or assigns, in good faith shall conduct development or producing operations thereon, and should production result from such operations, this sub-lease shall remain in full force and effect as long as oil, gas, casinghead gas or any like mineral shall be produced therefrom, and if Sublessee, its successors or assigns, shall commence drilling operations at any time while this sublease is in force it shall continue in force so long as such operations are prosecuted with reasonable diligence, and if production results therefrom, then so long as such production continues.

In consideration of the premises, said J. A. Hull Company, Sublessee covenants and agrees with Landowners Oil Association, Lessee, specifically as follows:

To deliver to the credit of the Winona State Bank, of Winona, Kansas, for credit by such bank to S. M. Jaggar as Trustee, for the collective use of the members of Landowners Oil Association Pool Number One, or his successor trustee at the time being, appointed by or pursuant to said original lease, as royalty, free of cost in the pipe-line to which Sublessee, or its assigns, may connect its wells on said land, the one-sixteenth part of all oil produced and saved from said tract of land, above described.

To pay monthly to such Trustee's credit in said bank, for such use, as royalty, for gas from each well, where gas only is found, while the same is being sold or used off the premises, and/or gas produced from any oil well and sold or used by Sublessee or its assigns, for the manufacture of gasoline or any other product, and/or for any other like mineral produced and sold or used off the premises, one-sixteenth of the local market value thereof in the field.

If no well be commenced on said land on or before the 5th day of August, 1930, this sublease from Landowners Oil Association, Lessee, shall terminate as to both parties, unless J. A. Hull Company, Sublessee, its successors or assigns, on or before that date shall pay or tender to the aforesaid Trustee's credit in said bank, or its successors, which shall continue as the depository regardless of changes in the ownership of said land and/or lease, for the same use, the sum of Eighty and no/100 ($80.00) Dollars, which shall operate as a rental and cover the privilege of deferring the commencement of a well for one calendar year from said date.

In consideration of the premises, said J. A. Hull Company, Sublessee, also covenants and agrees with Central Royalty Company, Assignee, specifically as follows:

To deliver to the credit of Central Royalty Company, Assignee, free of cost, as royalty, in the pipeline to which Sublessee may connect its wells on said land, the one-sixteenth part of all oil produced and saved from said tract of land, above described.

To pay monthly to Central Royalty Company, Assignee, as royalty, for gas from each well, where gas only is found, while the same is being sold or used off the premises, and/or for gas produced from any oil well and sold or used by Sublessee, or its assigns, for the manufacture of gasoline or any other product, and/or for any other like mineral produced and sold or used off the premises. one-sixteenth of the local market value thereof in the field.

If no well be commenced on said land, on or before the 5th day of August, 1930, this sublease from Assignees shall terminate as to both parties unless sublessee, on or before that date, shall pay or tender to Central Royalty Company or to its credit in Exchange National Bank at Tulsa, Oklahoma, or its successors, which shall continue as the depository, regardless of change in ownership of said land and/or lease, the sum of Eighty and no/100 ($80.00) Dollars, which shall operate as a rental and cover the period of deferring the commencement of a well for one calendar year from said date.

In consideration of the premises, said Sublessee further covenants and agrees with the Sublessors, Landowners Oil Association and Central Royalty Company, severally and respectively as follows:

In like manner and upon like payments or tenders, the commencement of a well may be further deferred for like periods of one year successively. The considerations above recited, the down payments, cover not only the privileges granted to the date when said first rental is payable as aforesaid, but also the Sublessee's options of extending that period for the ten year term of such sublease, as aforesaid, and any and all other rights conferred hereby.

Should the first well drilled on said described land be a dry hole, then, and in that event, if a second well is not commenced on said land within one year from the expiration of the last rental period for which rental has been paid, this lease shall terminate as to both parties, unless the Sublessee, its successors or assigns, on or before the expiration of said one year shall resume the payment of such rentals, in the same amount and in the same manner as hereinbefore provided and same shall have the same force and effect just as though there had been no interpretation [interruption] in the rental payment.

A closed gas well shall be deemed and held to be a producing well within the terms of this sublease.

If either of said Sublessors, Central Royalty Company and Landowners Oil Association, does not have good right to sublease an undivided one-half of such operating rights in and to said land, then the royalties and rentals herein provided for shall be payable to such Sublessor or its depository, only in the proportion which such Sublessor's interest bears to such half.

Lessors shall have gas free of charge from any gas well on said premises for all stoves and inside lights in the principal dwelling house on said land by making their own connections with the well, the use of said gas to be at their

sole risk and expense at all times. When requested by Lessors, Sublessee shall bury its pipelines below plow depth. No well shall be drilled nearer than 200 feet to the house or barn on said premises without written consent of Lessors or assigns. Sublessee, its successors or assigns, shall pay for damages caused by its operations to growing crops on said land.

If the estate of either party hereto is assigned, and the privilege of assigning in whole or in part is expressly allowed, the covenants hereof shall extend to their successors or assigns, but no change in the ownership of the land, leasehold or assignments of rental or royalties shall be binding on Sublessee, its successors or assigns, until after it has been furnished with a written transfer or assignment or a true copy thereof.

In event this sublease shall be assigned as to a part or as to parts of the above described lands and the assignee or assignees of such part or parts shall fail or make default in the payment of the proportionate part of the rents due from him or them, such default shall not operate to defeat or affect this lease insofar as it covers a part or parts of said lands upon which sublessee, or any assignee thereof, shall make due payment of such rental.

Landowners Oil Association, for itself and in behalf of Lessors and the members of said Pool Number One, hereby covenants that it has good right to convey to Central Royalty Company said undivided one-half of the royalty reserved in and created by said original lease, such half being one-sixteenth of the minerals, including oil, gas and casinghead gas in and under and that may be produced from said tract of land, and also one-half of the Lessee's operating rights, both for the unexpired term of said original lease and extensions thereof thereby provided for and also to sublet to J. A. Hull Company the remaining one-half of the Lessee's operating rights as provided in this sublease, and it likewise covenants in the same behalf that it and they will execute or procure any further necessary assurances of title thereto and hereby warrants and agrees to defend such title, and agrees that Assignee, Sublessee, and/or their successors and assigns may redeem for Lessors and/or Lessee, by payment, any mortgages, taxes or other liens on the above described lands, in the event of default of payment by them, or either of them, and be subrogated to the rights of the holder thereof.

Executed by Lessee, Assignee and Sublessee by their proper officers, attested by their respective corporate seals, and dated and effective this 5th day of August, 1929.

(This instrument was duly signed by the officers of the parties and duly recorded March 19, 1930.)

Exhibit "D," dated August 5, 1929, and duly recorded March 19, 1930, is identical in every way with Exhibit "C" except that it described the other 160 acres named in the petition.

Exhibit "B," dated May 22, 1931, and duly recorded September 29, 1931, is between the same parties as Exhibit "A" and is identical with that exhibit in all particulars except in paragraph 7 the funds there mentioned are to "be deposited to the credit of S. M. Jaggar,

as trustee, or to his successor trustee at the time being, in the Winona State Bank, of Winona, Kan.," instead of "in the Citizens State Bank, of Russell Springs, Kan.," as provided in Exhibit "A"; and in Exhibit "B" the following sentence is added: "In the event the trusteeship herein created shall become vacant from any cause whatsoever the grantee shall have the power to attach the land herein described to any other trusteeship within the state of Kansas"; and paragraph 9 was changed so as to read:

"That the trustee aforesaid shall, not less often than quarterly, make distribution of the money held by him as trustee in the following manner, to wit:

"(a) That from said fund there shall first be deducted and paid to the several members of the pool 75 percent of said money so held by the trustee as follows: Each member of the pool shall be entitled to share in the proportion that the number of acres he has conveyed to the pool bears to the actual number of acres comprising said pool.

"(b) That the said trustee shall next pay to the grantee, the Landowners Oil Association, the remaining 25 percent of said moneys available for distribution, in payment for its services, from which payment the said Landowners Oil Association shall pay all of the banking and trusteeship expenses."

## EXHIBIT "E"

### MINERAL CONVEYANCE

*KNOW ALL MEN BY THESE PRESENTS:*

That Central Royalty Company, a Delaware corporation, hereinafter called Grantor, for and in consideration of the sum of One Dollar ($1.00) cash in hand paid and other good and valuable consideration, the receipt of which is hereby acknowledged, does hereby grant, bargain, sell and convey unto Sinclair Prairie Oil Company, a Maine corporation, hereinafter called Grantee, all its right, title and interest in and to all of the oil, gas and other minerals in and under and that may be produced from the following described real property, and does hereby assign, set over and transfer unto said grantee all its right, title and interest in and to all term mineral deeds and oil and gas leases and instruments conveying or transferring to said grantee any and all mineral rights in, under and upon the following described tracts of land situated in the County of Graham, State of Kansas, as described on Schedule "A" attached hereto and made a part hereof, together with the right of ingress and egress at all times for the purpose of mining, drilling, exploring, operating and developing said lands for oil, gas and other minerals, and storing, handling, transporting and marketing the same therefrom with the right to remove from said land all of Grantee's property and improvements.

This sale is made subject to any rights now existing to any lessees or assigns under any valid and subsisting oil and gas leases of record heretofore executed; it being understood and agreed that said Grantee shall have, receive, and enjoy the herein granted undivided interests in and to all bonuses, rents, royalties and other benefits which may accrue under the terms of said leases insofar as

they cover the herein described lands, from and after the date hereof, precisely as if the Grantee herein had been at the date of the making of said leases the owner of said undivided interests in and to the lands described, and Grantee one of the lessors therein.

To HAVE AND TO HOLD the above described property and easements with all and singular the rights, privileges, and appurtenances thereunto or in any wise belonging to the said Grantee herein, its successors and assigns forever, and Grantor does hereby warrant the title to Grantee, its successors and assigns against the lawful claims and demands of all persons claiming by, through or under it.

IN WITNESS WHEREOF, Central Royalty Company has executed this conveyance this 1st day of October, 1936.

(This instrument was duly executed and recorded October 22, 1936. Schedule "A" lists 43 tracts of land, describing 7,760 acres in Graham county, including the land described in Exhibits "A" and "B.")

## EXHIBIT "F"

### ASSIGNMENT AND CONVEYANCE

THIS INSTRUMENT, Made and entered into this the 16th day of February, 1942, by and between Landowners Oil Association, a Delaware corporation duly authorized to transact business as a foreign corporation in the State of Kansas, hereinafter referred to as "ASSIGNOR," and SINCLAIR PRAIRIE OIL COMPANY, a Maine corporation duly authorized to transact business as a foreign corporation in the State of Kansas, hereinafter referred to as "ASSIGNEE."

WITNESSETH, That:

WHEREAS, on the 22nd day of May, 1931, a certain mining lease, hereinafter called original lease, was made and entered into by and between Frank E. Washburn and Rosa Washburn, his wife, of Hill City, Kansas, hereinafter called Lessor, and the Landowners Oil Association, as Lessee, covering the following described tract of land in the County of Graham and State of Kansas, to-wit: (Describing the land described in Exhibit "B,") said lease being recorded in the office of the Register of Deeds in and for said County in Book 8 at Page 35 which said lease empowered Lessee to sell and assign the royalty interests in the Minerals thereby created and reserved to Lessor, the proceeds therefrom to inure to the benefit of an acreage pool, known as Pool Number One, formed with said lease and other like leases, thereby authorized, payable through a Trustee therein named.

NOW, THEREFORE, in consideration of ONE ($1.00) DOLLAR, and other good and valuable considerations, paid by Assignee to the Trustee of such pool, named in said lease, the receipt of which is hereby acknowledged, said Landowners Oil Association, Lessee, in its own right as well as in execution of the powers in trust, expressed and implied in said lease, does hereby bargain, sell, transfer, assign and convey unto Sinclair Prairie Oil Company, Assignee, an undivided one-half of all of the one-eighth royalty and royalty interests reserved, created and authorized by said original lease, the same to

be paid to and/or kept by Assignee, its successors or assigns, directly, without the intervention and free from all claims of Lessor, Lessee, such pool members and/or such Trustees; together with and in addition thereto an undivided one-half of all of the Lessee's rights granted and created by said original lease, known as the working interest, except Lessee's powers in trust and right to future compensation for services thereby provided for; it being the intention hereby to convey, and Landowners Oil Association, Lessee, does hereby convey to Sinclair Prairie Oil Company, Assignee, an undivided one-half interest in and to all the minerals, including oil and gas, in and under and/or that may be produced from said tract of land above described, together with the right of ingress and egress at all times for the purpose of mining, drilling and exploring said lands for such minerals and removing the same therefrom as a tenant-in-common of such one-half thereof, for the unexpired part of the twenty year term and extensions thereof provided in said original lease, free from the payment of any royalty.

Landowners Oil Association for itself and in behalf of Lessor and the members of said Pool Number One, hereby covenants that it has good right to convey to Sinclair Prairie Oil Company said undivided one-half of the royalty reserved in and created by said original lease, such half being one-sixteenth of the minerals, including oil, gas and casinghead gas in and under and that may be produced from said tract of land, and also one-half of the Lessee's operating rights, both for the unexpired term of said original lease and extensions thereof thereby provided for; and it likewise covenants in the same behalf that it and he will execute or procure any further necessary assurances of title thereto, and hereby warrants and agrees to defend such title except as to mortgages appearing of record prior to Term Mineral Deed and Oil & Gas Lease dated August 5, 1929, executed by Assignor herein to Central Royalty Company, a Delaware corporation, the predecessor in interest of Assignee herein, recorded in the office of the Register of Deeds in and for said county in Book 6 at Page 572, as to any of the lands and premises herein above described and agrees that Assignee, and/or its successors and assigns may redeem for Lessor and/or Lessee, by payment, any mortgages, taxes or other liens on the above described lands, in the event of default of payment by them, or either of them, and be subrogated to the rights of the holder thereof.

This conveyance is executed in confirmation of that term mineral deed dated August 5, 1929, executed by said Landowners Oil Association to Central Royalty Company, a Delaware corporation and recorded in Book 6 at Page 572 of the records of the Register of Deeds in and for said County and State, the said Central Royalty Company having since conveyed all its right, title, interest, estate and equities therein to said Sinclair Prairie Oil Company and which said company is now the owner thereof, and this instrument shall not be construed as conveying an additional or cumulative interest in and to said lands hereinabove described; the intention being that said Sinclair Prairie Oil Company shall have and hold the interest, rights, benefits and property rights originally conveyed to said Central Royalty Company for and during the full term of said mining lease of May 22, 1931, and any and all extensions and renewals thereof.

In Witness Whereof, this assignment and conveyance has been executed the day and year first written.

(This instrument was duly executed by the Landowners Oil Association and duly recorded February 24, 1942.)