No. 30,758.

HARRY MOOS, *Appellee*, v. LANDOWNERS OIL ASSOCIATION, BART ROYALTY COMPANY, PETRO ROYALTY CORPORATION, E. S. HORN, Trustee for IMPERIAL ROYALTIES COMPANY, and R. H. JOHNSTON, *Appellants*.

(15 P. 2d 1073.)

Opinion filed November 5, 1932. 

*Ralph T. O'Neil, J. D. M. Hamilton, Barton E. Griffith,* all of Topeka, *O. O. Osborn,* of Stockton, *R. H. Hudson* and *M. D. Kirk,* both of Bartlesville, Okla., for the appellants.

*D. A. Hindman,* of Stockton, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one to cancel a conveyance whereby a landowner, who had leased his land for purpose of development of its oil and gas resources, pooled one-half of his royalty. The court rendered judgment for plaintiff, and the oil association, which formed and manages the pool, appeals.

Harry Moos gave an oil and gas lease of his quarter section of land, reserving a royalty consisting of one-eighth of the mineral produced, and rental of one dollar per acre per year, for postponed development. The Landowners Oil Association is a Delaware corporation, which was admitted to Kansas by the charter board for the purpose of conducting its business here. One feature of its business consists in pooling half interests in landowners' oil royalties, as indicated by the contract which it made with Moos. A copy of the contract is appended to this opinion. The association also engages in the business of pooling full royalty interests of owners of unleased mineral land. This pool is called Pool 1. The pool in which Moos' royalty was placed is called Pool A.

The petition alleged that the conveyance was procured by false and fraudulent representations; that the grantee had not procured a permit, as required by the blue-sky law; that the instrument was unfair and unconscionable; and that the instrument was obnoxious to public policy. After a trial the district court made some findings of fact on which it based the following conclusions of law:

"The contract between plaintiff and defendant is void, (a) because it is unconscionable; (b) because it was made, without authority, having been first obtained as required by R. S. 17, article 12 [blue-sky law]."

The journal entry of judgment contains the following:

"The court finds: That the conveyance or contract set out in plaintiff's petition is unconscionable and void *per se*, and is void for the further reason that at the time said conveyance was executed and up to and including the time this action was begun, the defendant, Landowners Oil Association, never had the right and authority under the laws of Kansas to sell, dispose, or exchange interests or shares in the said Landowners Oil Association, or any property held in trust or owned by it; and never complied with what is known as the blue-sky laws of the state of Kansas, and never applied for, nor received from the state bank commissioner of the state of Kansas, a permit to sell or dispose, or exchange interests, or shares, in said Landowners Oil Association, or any property held in trust or owned by it."

The conclusions of law and the judgment eliminate actual fraud and general contravention of public policy. That the grantee had not procured a permit under the blue-sky law when the conveyance was made was conceded. That the grantee was given a blue-sky permit after the action was commenced was not disputed.

The capital structure of the Landowners Oil Association was described in testimony given by the president of the corporation. The corporation has preferred stock and common stock. The preferred

stock consists of 1,000 shares of the par value of $100 each. Of these shares, 685 have been subscribed, and the corporation has received from that source $68,500. The common stock consists of 20,000 shares of no par value; 18,952 of these shares have been sold at prices of $5 and $7.50 per share, in the total sum of $103,490. Therefore, the paid-up capital of the corporation is $171,990. There was testimony that none of the shares have ever been offered for sale in Kansas. The court made no finding respecting these facts. Some of them at least were verifiable by the records of the charter board, and all of them were easily verifiable if disputed. They were not disputed at the trial, and are not now disputed.

The president of the corporation testified that all organization expense and all qualifying fees in the states of Kansas, Oklahoma, and Texas, where the company does business, were paid by the corporation.

It required no witness to testify that the capital of this corporation was not accumulated to lie idle. To earn money it had to be put to work, and if the venture were to be profitable, oil royalties had to be accumulated in great numbers over wide areas. In paragraph 7 of the contract Moos acknowledged that Pool A consisted of more than 10,000 acres of oil royalties already assembled by the corporation. There was testimony that there were approximately 25,000 acres in Pool A when the conveyance in controversy was executed, and about 30,000 acres with 130 pool members at the time of the trial. Five or six pool members were residents of Rooks county, and 9,000 or 10,000 acres were in the state of Kansas. The testimony was not disputed, but the court made no findings on these subjects.

In the court's formal findings of fact appears the following:

"This case presents an entirely different condition from that of the ordinary oil lease where the lessee or its assigns, before realizing, must invest $50 to $150,000. The operators of the schemes included in the contract under consideration paid one dollar for each lease, and paid for its charter, a mere pittance compared with the requirements of the ordinary oil company. They paid the trustee something like 12 cents for each check issued quarterly to each member of the pool. Again, compared with the legitimate oil company, that payment was a mere pittance. The remainder was such amount as was necessarily expended in procuring the leases and advertising the business of the promoters. The promoters received 25 per cent, less the amount paid the trustee, and the remaining 75 per cent, less the amount paid the trustee. Such probable profits with so little outlay and no probable losses, other than

their investments in promoting their plans, leads strongly to the conclusion that such contract is, in itself, a fraud upon those induced to furnish the material structure for such organization, and is absolutely void."

It will be observed the foregoing finding interprets the contract as giving the promoter all income less the amount paid the trustee. The findings of fact are preceded by an opinion in which the court said:

"The evidence showed that the trustee received very little for his services, and provided that of the profits, if any should result, practically 25 per cent of all such profits should go to the answering defendant for its services in procuring leases, organizing said pool, and negotiating sales of leases and royalties."

Later in the opinion appears the following:

"It is the opinion of the court, since examining the contract more carefully, that the contract is unconscionable in that it provides for a commission or allowance of 25 per cent for answering defendant's services, which together with the half of the remaining 75 per cent, which by the contract it would receive, the allowance for its promotion is excessive and unreasonable."

The result is, this court does not know how the trial court interpreted the contract.

Counsel for Moos explains the finding of fact in this way: The grantee first takes out 25 per cent of income for formation of the pool. Then trustee's expenses are deducted. Then 75 per cent of the remainder is distributed to pool members. Then the remaining 25 per cent goes to the grantee for management. There is no basis whatever in the contract for this interpretation.

There is no distinction in the contract between compensation for forming the pool and compensation for operating the pool. Out of its capital the corporation procures the royalty acreage in the pool, and manages the affairs of the pool. The landowners are at no expense. If income is derived, the corporation may use its share in procuring more royalty acreage, or in paying corporate expense, or in paying dividends, or otherwise as it desires. There was testimony that in this instance the corporation had used its share of income to enlarge acreage of the pool. However, the corporation gets nothing from the venture except a share of income, and that share is definitely fixed by the contract.

All income from every source is paid to a trustee, in this instance John G. Dennie, of the Farmers State Bank, of Russell, Kan. (contract, ¶ 2). The corporation, in consideration of formation

and management of the pool, receives 25 per cent of the funds in the hands of the trustee, after trustee's expenses are paid (contract, ¶ 3). The trustee distributes what he receives (contract, ¶ 4). The trustee first deducts his own expense, which is fixed by a contract made a part of the conveyance (contract, ¶ 4a), and which in fact is 12 cents for each check written in making distribution. The trustee then distributes the remainder. Seventy-five per cent of that sum goes to pool members (contract, ¶ 4b), and what is left, 25 per cent "as aforesaid"—that is, as said in paragraph 3—goes to the corporation (contract, ¶ 4c). The result is that the grantee's total share of income with which to pay cost and expense of every kind and to afford a profit to stockholders, is less than 25 per cent of the whole income, and the court's conclusion, after examining the contract "more carefully," that the contract is unconscionable, rests on a premise which has no foundation in fact.

Apparently the court based invalidity of the contract on the relation of cost of forming and operating the pool to what the corporation would receive from income.

It is not of the slightest consequence what it may cost a lessee of mineral land, who usually takes 87½ per cent of mineral produced, to operate for oil and gas, or what the comparison may be between cost of operating for oil and gas and cost of forming and operating a mineral royalty pool. The question is, Is this particular contract so grossly lacking in fairness that it cannot stand?

The contract did not show on its face what it did cost, or what it should cost, to form and operate Pool A.

In enumerating "pittances," the finding mentions one dollar per lease paid as legal consideration, and mentions "charter fee." The charter fee was organization expense. Perhaps fees paid by the corporation for admission to do business in three states were meant. The finding says "they" paid the trustee something like 12 cents for each check. . The corporation did not pay trustee's fees. Those fees were paid out of income. The finding speaks of "advertising the business of the promoters." There was no evidence the corporation spent anything for advertising its business. The finding speaks of probable loss of the corporation "other than their investments in promoting their plans." The corporate investment in Pool A was its proportion of $171,990, a tidy sum to lose if the business were unsuccessful, and a matter frequently taken into account in determining share of income.

The finding says "the remainder was such sum as was necessarily expended in procuring the leases." Assuming this refers to rent, office expense, salaries, compensation to and expense of field men, and all other expenditures in forming and operating the pool which the court had not listed, what was that amount?

The president of the corporation testified to the cost of forming the pool. Moos sold half of his royalty in 160 acres. That would be full royalty for 80 acres. The corporation's share is 25 per cent. That would be royalty for 20 acres. The president testified each such royalty had cost $140. Counsel for Moos says the figures were extravagant, and were not accepted by the court. There was no other evidence on the subject, and the burden rested on Moos to show that the contract was unconscionable.

It required no witness to testify that creation of a pool of considerable size would cost money. If the testimony relating to the size of Pool A be accepted, its creation would necessarily cost considerable money. If the testimony relating to actual cost of forming the pool were discounted, the sum would still be large. If the court did not know the amount from the evidence, the court could not make a guess of some small sum, and compare it with the inflated sum which the court indicated the corporation would receive, nor compare it with the true amount the corporation would receive. The share might in fact be large, but that alone would not make the contract unconscionable. The result is, there is no basis in the findings or in the evidence for the conclusion that the contract was unconscionable because the corporation's share of income, if there were income, was approximately 25 per cent of the whole.

Pursuant to power given in the contract, the corporation sold half of the royalty conveyed to it to the Bart Royalty Company, for $160. The price went to the trustee for distribution, with other income, to members of the pool (contract, ¶ 9). The lease itself was assigned to the Phillips Petroleum Company, which did not attempt to produce oil from the Moos land, but paid the rental of one dollar per acre per annum. Of the rental Moos received his unsold share, $80. Forty dollars of the rental went to the trustee for the benefit of the pool (contract, ¶ 2). The Bart Royalty Company received $40. During the same period Moos received from the trustee as dividends from operation of the pool the sum of $10.20. This was the situation at the time the findings of fact were formulated, and in connection with the conclusions of law referred to above, the court stated the following conclusion of law:

"3. Judgment for plaintiff for $40, less the amount actually paid by defendant to plaintiff, and any amounts now in the hands of the clerk of this court, which such amounts are ordered paid to the plaintiff."

Focusing one eye on surrender of $80 and receipt of $10 by Moos, the contract might seem one-sided, but the contract cannot be so appraised. How soon the lessee might choose to forfeit the lease as of proved worthlessness to both lessor and lessee, was not known. How great the returns from the pool might presently be, or might be in the course of twenty years of operation, was not known. The lessee's royalty belonged in a class of property subject to great fluctuation in value, as the possibility or probability of finding oil on the Moos land might increase or diminish. It may be it would have been wiser for Moos to have kept all of his royalty. It may be he drove a good bargain when he sold half of it. The fact cannot be determined in advance of demonstration of capability or lack of capability of the land to produce oil in paying quantities; and with the question open whether as a business proposition the sale was or was not advantageous to Moos, the court was not authorized to declare the contract was unconscionable, or intrinsically a fraud on Moos.

It is contended the contract was unconscionable because of paragraph 9, permitting the corporation to sell royalty interests, the proceeds to be paid to the trustee for the benefit of the pool. It is not contended the sale which was made to the Bart Royalty Company was not in good faith, nor for inadequate consideration, nor that the sale was in any respect detrimental to the best interest of the pool. The contention merely is the corporation might sell a royalty to a confederate for a small sum, and then divide with the confederate proceeds derived from a "gusher" subsequently brought in. Any trustee or possessor of a power may be guilty of breach of trust, but that does not make agreements creating trusts and powers unconscionable. All sales made by the corporation are for the benefit of the pool. The corporation must proceed according to those austere rules which govern the conduct of one acting in a fiduciary capacity. Every lessor who sells half his royalty has a double interest in production under his lease—his own share of the royalty, and the pool's share in which he participates—and the kind of fraud suggested could not be so readily resorted to as to make the contract under consideration vicious in its inception.

Other criticisms of the contract have been considered, and the

court holds that, as between Moos and the Landowners Oil Association, the contract was not unconscionable nor inherently fraudulent.

The royalty which Moos reserved when he leased his land for production of oil and gas belonged to him. It was property, and an essential element of its value consisted in privilege to sell it on terms satisfactory to him. In the brief of his counsel attention is called to the fact that Moos was of foreign birth and education, and that the orthography and syntax of his letters were poor; but, so far as capacity to contract is concerned, no abatement is shown between the time he made the lease and the time he sold part of his royalty. He tried to make out he was defrauded, but the court evidently believed the testimony of the agent of the corporation who negotiated with him for purchase of his royalty. If his contract is bad, the contracts of all other members of the pool are bad; and this is true no matter how desirous everyone except Moos may be of having his contract fulfilled. A royalty owner may be deprived of the property right to sell all or any part of his royalty, by means of a pooling contract otherwise valid, in one of two ways: First, by the legislature, acting under the police power in the interest of the general welfare; or second, by a court declaration that such contracts are so pernicious they cannot lawfully be made. The legislature has not prohibited such contracts and, without debating the subject, this court declines to do so.

The inordinate birth rate of the "sucker" is proverbial, and there is no birth-control measure adequate to inhibit the spawning of unscrupulous individuals who prey upon those who are easily duped. Hence we have a blue-sky law. That law, as it stood when the contract under consideration was made, made it unlawful to sell any speculative securities without first obtaining a permit. Securities include certificates of participation, or other instruments of like nature, whatever the name. Speculative securities include those the value of which materially depends on proposed or promised future promotion or development, rather than on present tangible assets or conditions. (R. S. 17-1201, subdiv. 4.)

Moos made a sale of his royalty. What did he get? He got such proportion of 75 per cent of the future income from the royalty pool as 160 acres of land bore to the number of acres in the pool. Looking at the transaction from the other side, the corporation sold to Moos such proportion of 75 per cent of the income from the royalty pool as 160 acres bore to the number of acres in the pool. The

consideration for this sale was Moos' royalty. Paragraph 4b of the contract provides:

"That each member of the pool shall be entitled to share in the balance at each periodical distribution in the proportion that the number of acres he has conveyed to the pool bears to the actual number of acres comprising said royalty pool."

Substitute in this provision the word "participate" for the words "shall be entitled to share," and we have an instrument which is a certificate of participation under the name of "Oil and Gas Conveyance."

When the corporation purchased its first landowner's royalty, what was it doing? It was issuing a speculative security, the value of which depended entirely on proposed and promised future promotion of a royalty pool. As the pool was enlarged, promotion continued to be material to the value of the participation certificates, at least for a considerable period. The first purchases may have been made in Texas or Oklahoma, but whenever the corporation commenced to operate in Kansas, promotion of the pool to the extent of adding to it 9,000 or 10,000 acres in Kansas, bore a material relation to the value of the securities. Therefore, the court concludes the corporation should have obtained a blue-sky permit. The court further concludes that essential elements of equitable estoppel precluding Moos from raising the question of necessity for a blue-sky permit are wanting.

The conveyance by Moos was a conveyance of an interest in land, and the instrument was duly acknowledged and recorded. As indicated, the corporation conveyed half of the interest it obtained from Moos to the Bart Royalty Company, for $160, and the conveyance was duly acknowledged and recorded. The Bart Royalty Company made the following conveyances: To C. E. Young, who conveyed to the Knickerbocker Royalty Company an undivided one-fourth, consideration not stated; to R. H. Johnston, an undivided one-sixteenth, for $62.50; to E. S. Horn, trustee for Imperial Royalties Company, an undivided three-sixteenths, for $187.50; to Petro Royalty Corporation, an undivided one-half, for $424. The Bart Royalty Company, and those holding under it, except the Knickerbocker Royalty Company, were made parties to the action. Their conveyances were cancelled, and they appeal.

At the trial it was stipulated as follows:

"At the times of each of the above conveyances, neither the grantor nor the grantee, in each conveyance, had any notice that Harry Moos made any

claims adverse to the interests of any of the defendants in this case, and neither of them had any notice that he made any claims adverse to these interests prior to that time.

"At the times of the above conveyance, neither Bart Royalty Company nor any of the other grantees had any actual notice that Landowners Oil Association did not have a permit from the state bank commission of Kansas, authorizing the sale of securities or the sale of any other contracts or conveyances that might come within the scope of the blue-sky laws of Kansas, and they had not had any such notice prior to the dates of these conveyances."

The Bart Royalty Company and its grantees were not engaged in promoting any kind of blue-sky enterprise. They were acting for themselves. They were not purchasing participation certificates or other kind of speculative securities. They were purchasers of interests in land, for value, without notice. They were not required to know, at their peril, whether the Landowners Oil Association had a permit authorizing it to pay Moos for the interest which it acquired, with speculative securities. Therefore, invalidity of the Moos conveyance does not affect their title.

The judgment of the district court in favor of plaintiff against the Bart Royalty Company and its grantees is reversed, and the cause is remanded with direction to enter judgment in their favor. The judgment in favor of plaintiff against the Landowners Oil Association only is affirmed.

HARVEY, J., would affirm the judgment of the district court in its entirety.

---

### OIL AND GAS CONVEYANCE.

#### (Term Royalty Interest.)

THIS AGREEMENT, Made the 27th day of February, in the year nineteen hundred and twenty-nine, by and between Harry Moos and Alvena Moos, his wife, of Plainville, Kansas, hereinafter called the grantor (whether one or more), and the Landowners Oil Association, a corporation existing under the laws of the state of Delaware, whose existence for all purposes is hereby admitted, hereinafter called the grantee;

WITNESSETH, That the grantor, for and in consideration of the one dollar ($1) in hand paid, receipt of which is hereby acknowledged, and of the covenants and agreements hereinafter contained, on the part of the grantor and grantee to be fulfilled, kept, and performed, has granted, conveyed, assigned, set over and delivered, and by these presents does grant, convey, assign, set over and deliver, unto said grantee and its successors and assigns an undivided one-half interest in and to all of the oil, gas, and all other liquid, semi-solid, and solid minerals in and under, and that may be produced from

the following described land situated in the county of Rooks, state of Kansas, to wit: southwest quarter of section 6, township 9, range 17, containing about 160 acres more or less, together with the right of ingress and egress at all times, for the purpose of mining, drilling, exploring and developing said lands for oil, gas, and all other minerals, and removing the same therefrom.

Said land being now under an oil and gas lease executed in favor of Ed Cronin, it is understood and agreed that this conveyance is made subject to the terms of said lease, but covers and includes one-half of the oil, gas and other mineral royalties and rentals due and to become due and to be paid under the terms of said lease, provided, however, the existing term of said lease shall not be extended or renewed without the written consent of the grantee first had and obtained.

It is understood and agreed the one-half of the money rentals which may be paid to extend the term during which a well may be begun under the terms of said lease shall be paid to said grantee, and in the event that said lease for any reason becomes canceled or forfeited, then, and in that event, an undivided one-half of the lease interests and all future rentals and bonuses on said land for oil, gas, and other mineral privileges, shall be owned by the said grantee, Landowners Oil Association, owning one-half of all oil, gas and other minerals in and under said lands together with one-half interest in all future events.

To HAVE AND TO HOLD the above-described property, together with all and singular the rights, privileges and appurtenances thereto, and in anywise belonging or appertaining, unto the said grantee herein, its successors and assigns, for a period of twenty years from the date hereof, provided that if production should result from operations upon this land during the aforesaid period, all of the rights of the grantee shall remain in full force and effect as long as oil, or gas, or casinghead gas, or any other mineral shall be produced therefrom.

In consideration of the premises, it is hereby mutually agreed as follows:

1. The grantee agrees that it will place the land above described in a royalty pool known as "Pool A," which now consists of more than ten thousand acres and shall not exceed one hundred thousand acres, having been and to be selected according to the judgment and at the expense of the grantee, said pool to be assembled on similar conveyances except as to duration of term; and it is mutually agreed between the parties hereto that the obligations herein assumed by the grantee are a valuable and sufficient consideration for this conveyance and the covenants and agreements of the grantor.

2. That all oil and gas or other mineral royalty or money and all rental and bonus money, as herein provided, shall be credited to and paid by the pipe line or other company directly to John G. Denie, as trustee, or his successor trustee at the time being, in the Russell Farmers State Bank, of Russell, Kansas, for the benefit of all of the members of the royalty pool referred to in paragraph one hereof.

3. That the grantee, in consideration of the formation and management of the pool, after trusteeship expenses have been paid, shall receive twenty-five

per cent of all income from every source, as herein provided, including bonuses, rentals and royalties.

4. That the trustee aforesaid shall, not less often than quarterly, make distribution of the money held by him as trustee in the following manner, to wit:

(*a*) That first shall be deducted and paid the expenses of trusteeship, as fixed by trusteeship agreement dated June 18, 1928, referred to herein and which is a part hereof.

(*b*) That seventy-five percentum of the balance then remaining shall be distributed among and paid to the several members of the pool as follows: That each member of the pool shall be entitled to the share in the balance at each periodical distribution in the proportion that the number of acres he has conveyed to the pool bears to the actual number of acres comprising said royalty pool. Provided, that if the royalty interests conveyed by such member be other than one-sixteenth of the total production from the grantor's land, then the share that the grantor shall receive shall be increased or diminished in the proportion that the actual interest he has conveyed bears to the full one-sixteenth.

(*c*) That the remainder, consisting of twenty-five percentum as aforesaid, shall be paid to the grantee for its services.

5. All payments which may fall due under this conveyance will be made to Harry Moos, one of the above-named grantors, in the manner herein stated, whose receipt of such payment shall be a full discharge of the grantee.

6. No change in the ownership of the land described in this conveyance, or any of the payments provided for herein, shall affect or bind the grantee until the purchaser shall have furnished the grantee an abstract of title to the land, certified to and showing as a part thereof, the title claimed by such purchaser.

7. The grantor acknowledges that "Pool A," referred to in paragraph one hereof, now consists of more than 10,000 acres of oil and other mineral royalty rights assembled by the grantee in accordance with the terms of this and preceding conveyances, and that the original 10,000 acres was secured by the said grantee and placed in this pool within six months from the date of the first conveyance.

8. The grantor hereby authorizes the existing lessee, if any, of the foregoing described land, to pay one-half of all future oil, or gas, or other mineral bonus, rental and royalty money to the trustee herein provided, for the purposes aforesaid.

9. The grantee may sell and assign the full royalty interest conveyed hereby, and the proceeds therefrom shall be paid to the trustee and inure to the benefit of the royalty pool.

10. The grantee shall not be liable for any defect in, or failure to discover any defect in, the title to any royalty in said pool, nor for any act, failure, or omission on the part of any member of the pool.

11. At the demand of the grantee, any taxes, mortgages, or other liens against said land shall be paid by the trustee first from any income accruing to the grantor.

12. The grantee shall have the right at any time to redeem for the grantor, by payment, any mortgage or mortgages, taxes, or other liens on the above-described lands, in the event of default of payment by grantor, and upon such payment shall be subrogated to all the rights of the holder thereof.

13. The grantor hereby warrants the title to the property conveyed by this conveyance and covenants to forever defend the same against all persons claiming the same or any part thereof.

14. This conveyance and all of its terms, conditions, and stipulations shall extend to and be binding upon, and inure to the benefit of all the heirs, executors, administrators and assigns of said grantor, and the successors and assigns of the grantee.

15. The grantor agrees to and with the grantee, its successors and assigns, that he has read and is informed of the contents of this instrument, and that there are no agreements or representations inducing the execution of this conveyance other than what is printed and written hereon.