No. 37,363

SINCLAIR PRAIRIE OIL COMPANY, and LANDOWNERS OIL ASSOCIATION, *Appellees*, v. A. D. WORCESTER and OAKIE B. WORCESTER, Husband and Wife, *Appellants*.

(205 P. 2d 942)

Opinion filed May 7, 1949.

*D. M. McCarthy*, of Hays, argued the cause, and *W. L. Sayers*, of Hill City, was with him on the briefs for the appellants.

*E. H. Hatcher*, of Topeka, argued the cause, and *William F. Pielsticker*, of Wichita, *James O. McVey*, of Hill City, *Ralph W. Garrett* and *Cecil R. Buckles*, both of Tulsa, Okla., were with him on the briefs for the appellees.

*Mark H. Adams, Charles E. Jones, William I. Robinson, J. Ashford Manka, Addison I. West* and *Russell Moore*, all of Wichita, *Walter F. Jones, J. Richards Hunter, Harry H. Dunn*, all of Hutchinson, *Clyde E. Beymer, J. Elton Beymer, Clyde Easton Beymer*, all of Lakin, and *Frank R. Collins*, of Ulysses, as *amici curiae*.

The opinion of the court was delivered by

SMITH, J.: This is an action to set aside a tax deed to real estate, and to quiet title to rights and interests claimed in the real estate.

The trial court overruled defendants' demurrer to plaintiffs' petition. Defendants have appealed.

The action has been in this court before. At that time we reversed the order of the trial court overruling defendants' demurrer and ordered judgment for defendants. On consideration of plaintiffs' petition for a rehearing we modified our opinion by making it provide merely that the demurrer be sustained. We did not order judgment. (See *Sinclair Prairie Oil Co. v. Worcester*, 163.Kan. 540, 183 P. 2d 947.)

Plaintiffs filed an amended petition. Defendants' motion to make definite and certain was allowed in part and overruled in part. A second amended petition was filed and defendants' demurrer to it was overruled. This appeal is from that order. The appeal was submitted after consultation. We ordered a reargument. The appeal was reargued and resubmitted.

The rights of the parties turn in the main on the validity of, and if valid the interpretation to be given, certain written instruments entered into between various parties, including the parties to this action involving mineral rights in two quarter sections of land. In the former decision we pointed out several particulars in which the basic instruments were invalid under the allegation of the petition we are considering. When the case was reversed and remanded to the trial court the plaintiffs in their amended petition sought to meet these deficiencies. The outcome of this appeal will depend on whether they were successful in that regard.

The petition in the former appeal was denominated "Petition To Remove Cloud." The first paragraph identified the parties. The second paragraph alleged the plaintiffs were the owners of mineral operating rights and mineral interests in two described quarter sections of land in Graham county, which arose from two written instruments, both executed between the Landowners Oil Association and defendants' predecessors in Title 1 under date of April 24, 1928, and the other under date of May 22, 1931. It may be stated here parenthetically that aside from the date and the two other inconsequential details these two instruments were identical. They will be referred to herein as Exhibits "A" and "B."

The petition then alleged that under the terms of these instruments the association became the owner of the mineral operating rights to produce oil and gas and an undivided seven-eighths work-

ing interest in the oil and gas that might be produced from the land in question and in addition was made trustee for the members of the one-eighth royalty pool, as specified in the instruments, with certain powers in trust, all to continue for twenty years from the date of each instrument or as long thereafter as oil or gas might be produced. The petition then alleged that by two written instruments under date of August 5, 1929, Landowners Oil Association assigned to Central Royalty Company an undivided one-half of its operating rights and an undivided one-half interest in the reserved royalty. These two instruments will be referred to as Exhibits "C" and "D"; that thereafter on October 1, 1936, the Central Royalty Company assigned to plaintiffs, Sinclair Prairie Oil Company, all its interest. This instrument will be referred to as Exhibit "E." Thereafter on February 16, 1942, the Landowners Oil Association delivered to Sinclair Prairie Oil Company a conveyance confirming its assignment of August 5 to the Central Royalty Company, stating it was its intention that Sinclair Prairie Oil Company should have all the interest conveyed to it by the Landowners Oil Association. This instrument will be referred to herein as Exhibit "F." It should be stated here parenthetically the foregoing instrument was apparently given so that Sinclair would be certain to have whatever interest had been conveyed to Central by the Landowners' conveyance on August 5, 1929.

The petition then alleged that in August, 1940, defendants in this action, who had succeeded the original grantors in interest in the land in question, obtained a tax deed covering the taxes for 1933, 1934, 1937 and 1938 attempted to be assessed upon mineral interests in the land in question against Central Royalty, Landowners Oil Association and Sinclair Prairie Oil Company; that the defendants, Worcester and the Federal Land Bank and the Federal Farm Mortgage Corporation, had placed a cloud upon the mineral interests by mortgages on the land in question; that these mortgages were inferior to the mineral interests of plaintiffs already described; that the Worcesters claimed adversely to plaintiffs on account of these mortgages and tax deeds; that the tax deed was void because the mineral interests acquired by Landowners from the Washburns were not taxable for reasons stated and because the tax deed was not recorded within six months from the date of its issuance, as provided by G. S. 1935, 79-2512, 2514.

The petition then alleged the mortgages held by the Federal Land

Bank and the Federal Farm Mortgage Corporation constituted clouds upon the mineral interests of plaintiffs. The plaintiffs then offered to do equity by paying to defendants any sum found by the court to be due defendants.

The prayer was that the tax deed be declared void; that the mortgages be held unenforceable against the mineral interests of plaintiffs and that mineral operating rights of plaintiffs be quieted against any claims of defendants.

As an amendment to this petition copies of the instruments to which reference had been made in the petition were attached. Since reference to them will be made throughout this opinion a résumé of them will be set out here.

The first was the instrument under date of April 24, 1928, executed by the Washburns and delivered to Landowners. It will be referred to as Exhibit "A." By it the Washburns conveyed to Landowners all oil, gas and other minerals under the land in question, with the right to enter and explore for a period of twenty years or as long as they should produce.

In consideration Landowners agreed to place the land in "an acreage pool known as Pool 1" which would consist of more than 25,000 acres and not more than, 500 assembled on similar conveyances, and it was mutually agreed that the obligations assumed by the grantee were a sufficient consideration for the conveyance.

By the next paragraph the grantee was given the privilege of assigning the whole estate with the understanding that it would reserve to the collective credit of the members of the pool one-eighth of all oil or gas saved from the land, or would deposit a sum of money equal to the value of the royalty at the prevailing market value. The last sentence of this paragraph provided, as follows:

"The grantee may sell and assign said royalty interest reserved herein, and the proceeds therefrom shall inure to the benefit of the acreage pool."

The next three paragraphs provided for the payment of royalty if grantees should drill the premises.

The next paragraph provided the same for gas and other minerals.

The next paragraph provided for the payment of royalty money to a trustee named for the benefit of the collective members of the pool.

The next paragraph provided for the payment to the grantee in consideration of the formation and management of the pool twenty-five percent of all income from bonuses, rentals, and royalties.

The next paragraph provided that the trustee should distribute to the pool members the money received by first deducting twenty-five percent for its services, next the reasonable expenses of banking and trusteeship, then the balance should be distributed to the several members of the pool so that each member would be entitled to receive a proportion that the number of acres he had conveyed to the pool bore to the actual number of acres comprising the pool.

Then followed some paragraphs with which we are not concerned. Then the following:

"The drilling of a well or sinking of a shaft for oil, gas or other minerals is not necessary for the continuance of the life of this conveyance."

The remaining paragraphs are of no interest to us here.

The next exhibit was the instrument of May 22, 1931. It will be referred to as Exhibit "B." Except for the date, a provision about filling a vacancy in the trusteeship and a provision that when money should be distributed to the pool members the seventy-five percent due should be paid first and the banking and trusteeship be taken out of the grantee's twenty-five percent, the instruments were identical.

The next two exhibits were the two conveyances of August 5. They will be referred to as Exhibits "C" and "D." These instruments were identical except that they each covered a different one of the quarters with which we are dealing. The first paragraph refers to Landowners as lessee, Central Royalty Company as assignee and J. A. Hull Company as sublessee. It recited the powers given Landowners in Exhibit "A" to assign royalty interests and then conveyed in its own right and in execution of the powers of trust to Central Royalty an undivided one-half of the royalty interest conveyed to it in Exhibit "A" as well as an undivided half of the working interest as a tenant in common for the term of twenty years from the date of Exhibit "A." Landowners and Central then as tenants in common leased to J. A. Hull the right to operate a lease for oil and gas for a term of two years from August 5, 1929, to the date of the instrument. In consideration J. A. Hull agreed to deliver to the trustee named one-sixteenth of all oil produced as royalty. The instrument provided that if no well be commenced by August 5, 1930, the lease from Landowners to Hull would terminate unless Hull would pay to the trustee $80 rental a year. J. A. Hull also agreed with Central to deliver to it one-sixteenth of the oil produced and if no well be commenced by August 5, 1930,

the lease to terminate unless Hull should pay Central $80 a year rental; in consideration Hull agreed with Landowners in a like manner as to deferred payments. There were other provisions with which we are not presently concerned. It will be noted that Exhibit "C" and "D" were executed after Exhibit "A" but before Exhibit "B."

The next instrument attached was between Central Royalty Company and Sinclair Prairie Oil Company under date of October 1, 1936. It will be referred to in this opinion as Exhibit "E." By it for consideration of one dollar Central conveyed to Sinclair Prairie Oil Company its mineral rights in land described in a schedule attached, which included the two quarters in question.

The next exhibit was an instrument between Landowners and Sinclair under date of February 6, 1942. It will be referred to as Exhibit "F." It first referred to Exhibit "B" and stated that it authorized Landowners to sell royalty interests. It then conveyed by Landowners to Sinclair in its own right, as well as in the execution of powers in trust expressed in Exhibit "B" one-half of the one-eighth royalty reserved by Exhibit "B" free from claims of the pool members, the Washburns, Landowners or the Trustees and in addition one-half of the working interest except Landowners' powers in trust and right to compensation. It recited that by the instrument Landowners conveyed to Sinclair Prairie an undivided one-half interest in all the mineral that might be produced from the land in question for the unexpired part of the original twenty-year term and extensions provided. The instrument recited that it was executed in confirmation of the term "mineral deed," dated August 5, 1929. This referred, no doubt, to Exhibit "C" and "D."

Defendant's demurrer to this petition was overruled. On appeal to this court defendants argued that Exhibits "A" and "B" were void on their face; that there was no consideration for them and they were so uncertain in their terms that a court of equity would not enforce them. We reversed the judgment of the trial court and held:

"Considering the petition of the grantee and its assignee upon the contracts relating to oil, gas and other minerals, and the demurrer of defendants thereto, it is by the court held: (1) The petition was not drawn upon a definite theory. (2) Exhibits 'A' and 'B' do not clearly state the rights and liabilities of the parties as to the petition and exhibits disclose plaintiffs interpreted them, and with respect to the interpretation given the instruments by plaintiffs, the minds of the parties never met. (3) Exhibit 'B,' insofar as

plaintiffs' claimed rights to minerals in place, and Exhibits 'C' and 'D' are void under G. S. 1935, 79-420. (4) Exhibits 'A' and 'B' do not declare or imply trust powers in the grantee. (5) The provisions of paragraphs numbered 1 and 2 are for the benefit of the grantee and do not constitute a consideration to the grantor. (6) The only consideration to the grantor disclosed by Exhibits 'A' and 'B' is the one dollar paid. (7) Exhibits 'A' and 'B,' as the court is asked to construe them under plaintiffs' petition and exhibits, is decidedly advantageous to the grantee. When one goes into a court of equity to have rights decreed under a contract the court looks to the entire instrument together with any action taken by the parties thereunder, and endeavors to frame its decree in harmony with applicable rules of equity. (8) A court of equity should refuse to enforce a contract where the consideration for it is grossly inadequate and its terms are otherwise unfair.'" (p. 540.)

As already stated in this opinion, we at first ordered final judgment for defendants, but on consideration of plaintiffs' motion for a rehearing we modified our mandate so as to merely order the demurrer sustained.

The question in the present appeal is whether plaintiffs have in their second amended petition cured the defects we pointed out in the one that was here before.

This amended petition now before us alleged the execution of the various instruments substantially as alleged in the first petition. As to Exhibits "C" and "D," however, they alleged that Central Royalty Company paid $250 in cash to the trustees of the pool for the rights assigned it by the Landowners in reliance on the acquiescence of the Washburns in the entire transaction after they had been advised of the activities of Central and this consideration was duly distributed to the pool members. It also alleged that Sinclair Prairie paid Central $900 for the interests conveyed to it without any notice that anyone claimed any interest adverse to Central.

We come now to that portion of the second amended petition in which plaintiffs argue they met the deficiencies in the petition upon which we have already ruled. In our opinion (See *Sinclair Prairie Oil Co. v. Worcester,* supra) we pointed out that provision in Exhibits "A" and "B" in which plaintiffs agreed to place the land in question in an acreage pool and the provision "and it is mutually agreed between the parties hereto that the obligations herein assumed by the grantee are a valuable and sufficient consideration for this conveyance and the covenants and agreements of the grantor." We then said:

"We think this cannot be regarded as a consideration moving to the grantor for the reasons: *First,* that there is no allegation in the petition that the agree-

ment of the grantee was ever performed. *Second,* this paragraph did not make the 'grantor' a member of the 'acreage pool.' Indeed, that term is not defined in the instrument. It does not state what interests the grantor would have in the acreage pool, if it had been or was to be formed. It does not provide for the issuance of a certificate to him stating his membership and outlining his interests therein, nor does it provide for a list of the lands in such pools to be furnished the grantor. There is no allegation in the petition that any of those things was done. *Third,* if the grantee performed the agreement and made its own selection of lands, at its own expense, it did so for its own benefit, as shown by subsequent provisions of the instrument (pars. 2 and 8) and the subsequent instruments executed (Exhibits 'C,' 'D' and 'F') and not for the benefit of the grantor. This could not constitute a benefit moving to the grantor." (p. 545.)

In paragraph six of the second amended petition plaintiffs first alleged that the correct interpretation of Exhibits "A" and "B" was that on the execution of Exhibits "A" and "B" the land covered thereby went immediately into Pool 1. Correspondence to this effect was attached to the petition.

The petition next alleged that the obligations of the grantees assumed in "A" and "B" had been fully performed in that the Washburns were advised as to this activity of the Landowners in connection with Pool 1 at the time Exhibits "C" and "D" were executed. Exhibits "A", "G" and "H" were letters under date of June 8 and July 17, 1929, to all pool members advising them of the number of acres in the pool and of the sale of one-half of the royalty to Central Royalty Company.

The petition alleged that the Washburns were fully advised that only a small percentage of land is productive of oil and gas and that the agreement of Landowners to form the pool and make profits available to all pool members was one of the moving considerations for the execution of Exhibits "A" and "B."

Plaintiffs alleged as a fact that the agreement to form the pool and to make the benefits available to all the pool members, the acreage capable of production not being known, was one of the moving considerations for the execution of Exhibits "A" and "B."

The amended petition then alleged certain activity of Landowners in endeavoring to obtain production on the acreage in the pool. At the time the petition was written there were seven wells productive of oil or gas on acreage belonging to the pool obtained by plaintiff with a total value of $215,000 and the full amount of royalty payable to Pool No. 1 had been paid to the trustees, and four other wells had been completed and awaited connection with the pipe

lines; that six of these wells were drilled by the Black-Marshall Oil Company; that plaintiff Sinclair Prairie Oil Company paid one-half the cost of these wells or $107,257.72 and Black-Marshall, the lessee of Sinclair, paid the other half; that Sinclair owned one-half the seven-eighth working interest in these wells and in addition one-half of the one-seventh royalty the other one-half of the one-eighth royalty belonging to the pool members; that Landowners claimed no interest in the working interest or the royalty interest but did claim a right to participate in the distribution of money to the pool members; that Landowners caused the seventh well to be drilled by the Fin-Ker Oil and Gas Production Company; that Sinclair claimed 24/512ths of the gross production of all gas from this well and the members of Pool 1 were entitled to 32/512ths of it and Landowners claimed 8/512ths of it.

The petition then alleged plaintiffs had caused four dry holes to be drilled at a cost of $60,000; that they had caused ten off-setting test wells to be drilled on land adjacent to which it did not own any acreage except land in Pool 1.

The amended petition then alleged that after the execution of Exhibit "A" by the predecessors of defendants, Landowners paid to them through the trustee $160 as dividends to cover the 640 acres named in Exhibit "A" and thereafter between that date and May 22, 1931, the date of the execution of Exhibit "B" ten payments of dividends to the Washburns through the trustee aggregating $358.88.

The petition then referred to Exhibit "N" attached to the petition, which was a letter signed by the Washburns, and which acknowledged the receipt of the regular dividend and in addition thereto $1 in consideration of which the Washburns ratified Exhibit "A" and then alleged payment to the Washburns through the trustee in 1931, 1932 and 1933 of dividends in the amount of $11.49.

The amended petition then alleged that Landowners paid to defendants through the trustee one dividend each in the years from 1935, inclusive, to 1941, aggregating $39.60, and on December 27, 1945, a check for a dividend in the amount of $4.80 to defendants, together with a letter, Exhibit "O," which pointed out that supreme court decisions had been favorable and they had invested $125,000 in the management and by the time they received the latter the pool members would have received $375,000 and that defendants had acknowledged receipt of the check and had stated in a letter

that they had lost the check for 1935 and requested that they send another one. The petition then alleged that by the receipt of these payments amounting to $424.37 the Washburns and defendants had ratified and confirmed the rights of plaintiffs under Exhibits "A" and "B' and were estopped to deny receipt of a consideration for the performance of the obligation of plaintiffs under "A" and "B" and were estopped to deny the validity of the rights covered by these instruments; and the facts alleged, the placing of the land in the pool, the payment of the dividends, the acceptance of the payments by defendants constituted a complete performance of "A" and "B" by Landowners.

The petition then alleged the acquiring of a tax deed to the land in question by defendants after they and their predecessors in title had received the benefits for twelve years for the purpose of depriving plaintiffs of their rights; that defendants claimed adversely to plaintiffs; that the tax deed was a cloud on plaintiffs' title and a denial of the relief prayed for would deprive plaintiffs of their property without due process of law and would constitute a denial to them of the equal protection of the law; that the tax deed was void because the rights acquired by Landowners and Sinclair Prairie, which were acquired by them by virtue of the instruments described, were not legally subject to taxation because they did not operate to constitute a severance of the ownership of the oil or gas from the ownership of the surface of the land, as contemplated by G. S. 1935, 79-420, and by reason thereof the tax deed was issued without authority of law and was void; that it was unenforceable because it purported to convey the entire title to the land without excepting therefrom the mineral rights; that it was void because it was not filed for record within six months of the date of its issuance, as required by G. S. 1935, 79-2512 and 79-2514.

The plaintiffs offered to do equity and to pay into court any amount which might be legally payable to them.

The prayer of the petition was that the tax deed be adjudged void and removed as a cloud; and that the interests pertaining to the minerals vested in plaintiffs be quieted in them as against any claims of defendants and for further equitable relief.

To this petition, defendants moved to strike all of the paragraphs from the petition which alleged defendants acquired the tax deed for the purpose of depriving plaintiffs and the other pool members of any possible benefits from the minerals under the land; and

also to strike that paragraph that alleged a denial of the relief prayed for would constitute a taking of plaintiffs' property without due process of law and would deny them the equal protection of the law. The trial court allowed the motion as to the first portion but denied it as to the latter.

Thereupon defendants demurred to the petition on the ground it departed from the purported cause of action stated in the petition once passed upon by this court and the court was without jurisdiction; that plaintiffs had no legal capacity to sue; another cause of action pending for the same cause, the first cause of action, attempted to be stated, several causes of action improperly joined and the amended petition failed to state facts sufficient to constitute a cause of action.

This demurrer was overruled. Hence this appeal.

Defendants first argue that the trial court erred in permitting plaintiffs to file the amended petition and in overruling their motion to strike it from the files. The basis of this argument is that in their second amended petition, which is now before us, plaintiffs attempt to relitigate in this appeal a question which was decided against them in the first one. They argue they brought the first petition on the theory that Exhibits "A" and "B" conferred powers in trust on them. They point out that we held in our first opinion *Sinclair Prairie Oil Co., v. Worcester,* 163 Kan. 540, 183 P. 2d 947, that these instruments did not create trust powers, yet notwithstanding this, plaintiffs have drawn their second amended petition on the theory that Exhibits "A" and "B" created trust powers. They cite authorities where we have held that where a second appeal is brought to this court in the same case the first decision is the settled law of that rule. The question is whether plaintiffs are actually attempting to relitigate the same question. On account of the nature of this argument the pleadings and exhibits have been set out rather more fully than they otherwise would have been. We hold that a reasonable interpretation of the petition is that each action was brought to set aside a tax deed, and for incidental relief of having plaintiffs' title to the mineral rights quieted. While Exhibits "A" and "B" do mention trust powers and we held in the first opinion that no trust powers were conferred, still the actual basis of plaintiffs' claim to relief in each petition was the rights conveyed to drill if such course be deemed wise, to sell royalty, to convey rights to drill, and to distribute the proceeds. The only

difference between the petitions in the two appeals is that this petition sets out what plaintiffs actually did in the way of carrying out the consideration for Exhibits "A" and "B." The two actions are essentially on the same theory. (See *Columbian Title and Trust Co. v. City of Tribune,* 133 Kan. 51, 298 Pac. 798; also *Dalton Adding Machine Sales Co. v. Crowder,* 126 Kan. 19, 266 Pac. 747; also *Thomas County Coöp. Business Ass'n v. Pearson,* 130 Kan. 622, 287 Pac. 242.)

Defendants next argue that the trial court erred in overruling their motion to require the plaintiffs to make their petition more definite and certain in certain specified particulars. We have examined this motion. It was sustained in certain particulars and in others denied. Very little would be added by setting out the various paragraphs of the motion. Suffice it to say that the motion asked that plaintiffs be required to set out evidence and in no case the portions of the motion that were denied asked for any details incidental to plaintiffs' claimed cause of action. The granting or sustaining of a motion to make definite and certain is addressed in a large measure to the discretion of the trial court. We hold that the trial court did not abuse its discretion in ruling on this motion.

Defendants next refer to their motion to strike certain paragraphs from plaintiffs' petition. The amended petition contained an allegation, as follows:

"X.

"These plaintiffs further allege that the denial of the relief prayed for herein under the facts alleged in this petition would constitute the taking of plaintiffs' property without due process of law, and would constitute the denial to them of the equal protection of the law, all as prohibited by the Fifth and Fourteenth Amendments to the Constitution of the United States."

Defendants asked the court to order this paragraph stricken. The motion was overruled and defendants argue this was error. This allegation was but little more than a conclusion of law. It is difficult to see how leaving it in the petition worked any prejudice against the defendants.

Defendants argue that plaintiffs cannot show they were denied due process of law under the facts pleaded. Granted that this is true, still the above quoted paragraph in the petition does not prejudice defendants.

Defendants present their next two points together, that is, that the trial court should have sustained their demurrer to the second

amended petition, and erred in not holding Exhibits "A," "B," "C," "D," "E," and "F" void. This is but two different ways of stating the same question since if these exhibits were void the petition would not state a cause of action.

The basis of this argument is that Exhibits "C" and "D" were executed after Exhibit "A" but before Exhibit "B" and hence Exhibit "B" is of no force and effect since all the drilling was done and other activity was had under Exhibits "C" and "D" and the latter have no relation to Exhibit "B." They point out that Exhibit "B" does not set out any ratification of Exhibit "A" and does not purport to be a novation contract but is a stranger to it. In this connection they point out that since Exhibit "A" has expired by lapse of time under its own terms and Exhibit "B" never was acted on by the parties, there are no valid instruments upon which to base a judgment in favor of plaintiffs.

The answer to this argument is that whatever name be given Exhibit "B" with reference to Exhibit "A" the two were substantially identical terms. Defendants and their predecessors in title accepted payments from plaintiffs operating under Exhibit "A" and after Exhibit "B" was executed, continued to accept these payments and to recognize the operation of the pool. Exhibit "A" was fully carried out by plaintiffs and defendants cannot escape the binding force of Exhibit "B" just because it was executed at a subsequent date. It is pointed out by defendants that some of the pool members under Exhibit "A" might not have executed Exhibit "B." That may very well be, but we do not have such a case here. Defendants' predecessors did execute it and for years defendants accepted some benefits from it.

In *Sutherland v. Madden,* 142 Kan. 343, 46 P. 2d 32, we said: ·

"'It is a rule established by many well-considered cases that parties to a lease cannot escape from their secondary (modifying) agreement on the ground of want of consideration, where it has been fully executed, nor, if partially executed on both sides, can they repudiate that part of it which had been executed, though the unexecuted part may be repudiated unless grounds of equitable estoppel exist.' (43 A. L. R. 1458.)" (p. 346.)

In our former opinion we held Exhibit "B" insofar as plaintiffs claimed rights to minerals in place and Exhibits "C" and "D" are void under G. S. 1935, 79-420. In answer to this, plaintiffs point out that they do not claim any rights to minerals in place and do not contend that Exhibit "B" conveyed such. Furthermore, the amended petition alleges that Exhibit "B" was executed May 22, 1931, and

filed for record September 29, 1931, which was prior to March 1 of the year following its execution. This had the same legal effect as listing it for taxation. (See *Richards v. Shearer*, 145 Kan. 88, 64 P. 2d 56; also, *Davis v. Skelly*, 159 Kan. 282, 154 P. 2d 114.)

Defendants next argue that their demurrer should have been sustained because the petition discloses on its face that the minds of the parties never met. They point out that in our former opinion we held, in part, "And with respect to the interpretation given the instruments by plaintiffs, the minds of the parties never met." Under the pleadings we were reviewing in the former appeal that statement was correct. This amended petition, however, sets out in detail just what the dealings of the parties were subsequent to the execution of Exhibits "A" and "B." The amended petition discloses that on July 17, 1929, the Landowners Oil Association informed all members of the pool, including defendants' predecessors, in a letter, as follows:

"Your pool now consists of about 124,000 acres of carefully selected land located in Kansas, Oklahoma and Texas, and can not exceed 500,000 acres. To the Central Royalty Company we have assigned a half of the royalty reserved in the leases to us, embracing 100,000 acres in western Kansas. . . . With the exception of 1,760 acres just previously leased to the Continental Oil Company, we have entered into ten-year leases on the same land with the J. A. Hull Company for development. . . . We will continue to lease the rest of the land in your Pool One for development. It seems, therefore, that the dividend may be larger than stated in my letter of June 8."

The petition and exhibits disclose that the parties were informed the one-half of their royalty had been sold and that payments they would receive and did receive were the proceeds of that sale. Granted that for the sake of argument the language of Exhibits "A" and "B" was ambiguous and indefinite, still the interpretation put upon it by the parties themselves is clear enough. (See *Kennedy v. Glen Cove Mut. Ins. Co.*, 154 Kan. 327, 118 P. 2d 591.)

Defendants argue that their demurrer should have been sustained because Exhibits "A" and "B" grant such unfair advantages to the grantee as to be unconscionable. This argument turns in a large measure upon the clause in Exhibits "A" and "B" giving the grantee in those instruments power to sell all or part of the one-eighth royalty usually reserved to lessors and reserved to the pool members in these two exhibits. The petition and the exhibits all show that one-half the royalty reserved to the pool members on the land in question was sold and the proceeds paid to the pool

members in accordance with the formula provided in the instruments, that is, defendants were paid in proportion that the number of acres put into the pool by them bore to the entire number of acres in the pool. In our former opinion we held, in part, Exhibits "A" and "B" as the court is asked to construe them under plaintiffs' petition and exhibits are decidedly advantageous to the grantee. The foregoing was correct as applied to the petition we were considering at that time. It will be noted, however, that it falls a little short of being a holding that the exhibits are so advantageous to grantee as to be unconscionable. At any rate, the amended petition has supplied sufficient details as to the manner in which the pool was operated in this respect so that the exhibits in the light of the allegations of the present petition, the advantage to the grantees seems less marked. In the first place, it appears from the petition that this one-half royalty in some of the acreage was sold as an added inducement to drilling companies to cause them to drill on some of the acreage. Defendants were advised of this and approved it by continuing to accept payments. Furthermore wherever exploration is going on in unproven territory it is not uncommon for the lessor to sell part of his royalty interest in order to cause drilling companies to expend the money necessary to drill. By thus buying royalty the drilling company increases the odds in its favor. This is one advantage to the drilling company, but not such an advantage as would be deemed unfair. Furthermore, our further analysis of the instruments discloses that in the case of defendants where some of their royalties were sold but their land was not drilled, they still share in the proceeds of the pool on the original basis even though some of the royalty had been sold. The only difference the royalty sale made was that less money went into the pool when production was had on that land. However, all the pool members shared in the division of proceeds from the sale of royalty. That is so clearly the result that follows from the operation of a pooling contract that it can hardly be said to be unconscionable on the face. It was explained to defendants' predecessors at the outset that a pooling contract is one where many landowners contribute acreage in the hope that if oil is found on any of the acreage all the owners will profit. It is a variation of the principle of spreading a business risk over a number of enterprises in the hope of a more certain, if smaller return. We are not holding the landowners were wise to sign such instruments as Exhibits "A" and "B." We are only holding the instruments were

not unconscionable. (See *Moos v. Landowners Oil Ass'n,* 136 Kan. 424, 15 P. 2d 1073; *Beltz v. Griggs,* 137 Kan. 429, 20 P. 2d 510, and *Eichman v. Landowners Oil Ass'n.,* 153 Kan. 791, 113 P. 2d 1056.)

Defendants argue that their demurrer should have been sustained because the petition shows on its face the Landowners Oil Association did not pay any consideration for Exhibits "A" and "B." In our first opinion we held: "The provisions of paragraphs number 1 and 2 (of exhibits A and B) are for the benefit of the grantee and do not constitute a consideration to the grantor." In the light of the petition we were then considering such statement was correct. The amended petition has amplified the allegations in that respect, however. In the first place, defendants devote considerable space in their brief to a calculation of how small the payments were to defendants and their predecessors over the years. In the absence of a showing that these instruments prevented defendants from having their land drilled it would seem that what money was paid defendants and their predecessors was money they would not have received at all if they had not executed Exhibits "A" and "B." Furthermore, inadequacy of consideration is not good ground for setting aside a conveyance unless it is so glaring as to stamp the transaction with fraud and to shock the common sense of honesty. (See 16 Am. Jur. Jur., Deeds, 33; *Gulf Rld. Co. v. Comm'rs of Miami County,* 12 Kan. 482.) The smallness of the consideration may be looked to in weighing the evidence of fraud but alone is not enough to warrant setting aside a conveyance. (See *Williams v. Church,* 198 P. 2d 995.)

At any rate, the amended petition sets out at length all the facts about defendants' predecessors and defendants being advised they were in the pool, the number of acres in the pool and how it was being conducted. The amount of money expended by plaintiffs in operating this pool and carrying out the provisions of Exhibits "A" and "B" will not all be set out here. The cost was well over $200,000. From this expenditure defendants have or will benefit. The rule is stated at 17 C. J. Contracts p. 335 as follows:

"Although there is a lack of mutuality in the beginning, this may be cured by the other party subsequently binding himself also by promise or act. Thus, if A promises B to pay him a sum of money if he will do a particular act or make a particular promise, and B does the act, the promise thereupon becomes binding, although B at the time of the promise does not engage to do the act or to make the promise. In the intermediate time the obligation of the promise is suspended, for until the performance of the condition of

210

the promise there is no consideration, and the promise is *nudum pactum*; but, on the performance of the condition by the promisee, it is clothed with a valid consideration which relates back to the promise and it then becomes obligatory."

See, also, *Nelson v. Schippel,* 143 Kan. 546, 56 P. 2d 469; 13 C. J. 334; *Electric Management & Engineering Corp. v. United P. & L. Corp.,* 19 Fed. 2d 311. The plaintiffs have fully performed according to the allegations of the petition sufficient obligations of Exhibits "A" and "B."

Defendants next argue that their demurrer should have been sustained because Exhibits "A" and "B" are gambling contracts. They in common with most contracts having to do with the oil business have an element of speculation in them. If we would brand these two instruments unenforceable on account of being gambling contracts, however, we would have to strike down half the contracts in the oil business.

The judgment of the trial court is affirmed.

WEDELL and PRICE, JJ., concur in the result.

ARN, J. (dissenting): I am unable to concur in all the conclusions reached by the court. This case, involving substantially the same issues and the identical written instruments, was decided by this court (163 Kan. 540) in an opinion dated August 12, 1947. There it was held the demurrer to the first amended petition should have been sustained. We are here concerned with the second amended petition which adds a new paragraph.

When this court passed upon the sufficiency of the first amended petition, in the former well-considered opinion with which the full court was in accord as to the result there reached, the same two written instruments, Exhibits A and B, were examined. These exhibits (Exhibit B is almost identical with Exhibit A) and others are recited in full as an appendix to the former opinion, pages 554-565. It was then held among other things that Exhibits A and B did not clearly state the rights and liabilities of the parties and were so ambiguous that the minds of the parties never met; that they did not imply trust powers in the grantee; that the provisions of paragraphs one and two of the exhibits were for the benefit of the grantee and did not constitute a consideration to the grantor; and that the instruments construed as the court was asked to construe them were so decidedly advantageous to the grantee, so un-

reasonable and unfair, that a court of equity could not enforce them. The new paragraph added to the second amended petition since Exhibits A and B were last considered by this court has not changed the instruments themselves, nor does it alter their legal interpretation. Consequently, this second amended petition attempts to relitigate matters which were fully decided by this court in the previous opinion referred to above. The theory upon which plaintiffs predicate their second amended petition must be the same as that of the former petition, else there is a fatal departure.

Exhibits A and B are upon their face unreasonable and unfair and demand of the landowner an unconscionable bargain for which the consideration was grossly inadequate. These instruments purport to give the grantee a twenty-year mineral lease without any delay rental in lieu of drilling, with a specific covenant that no development will ever be required of the grantee, and takes from the landowner twenty-five percent of the landowner's customary one-eighth royalty—and with a further provision that *all* of the landowner's one-eighth may be sold or conveyed at any price to any third person by the grantee without the landowner's further consent. Also, by these instruments, the landowner grants an easement over his land for purposes of exploration, drilling, oil and gas development, storage of both oil and salt water, construction of ponds, pits, pipe lines, telephones and power lines, derricks and rigging, and indeed any other construction incidental to oil and gas development. All of these, together with the reference of such instruments regarding the formation of an acreage pool, are considerations moving to and in favor of the grantee. The nominal consideration received by the grantor is grossly inadequate. Such an instrument would create a situation by which those who are skilled in the technical operations of drilling, of dealing in royalties and mineral conveyances, and in explorations for oil and gas, may finesse a trusting landowner out of all his minerals, leaving to him only his surface rights—and with those rights subject to the easements for all purposes incidental to oil and gas development. In this respect it is contrary to public policy.

Plaintiffs rely, as they did when this case was here before, upon *Moos v. Landowners Oil Ass'n,* 136 Kan. 424, 15 P. 2d 1073. That case was different from the instant case. There the instrument before the court was decidedly more favorable to the farmer who merely conveyed one-half of his royalty to the Landowners Oil As-

sociation after he had already leased his land for a valuable consideration. A great part of that opinion considered the question of whether the instrument was a speculative security. Furthermore, the instrument involved in the Moos case was reasonably definite and from it the rights and liabilities of the parties could be fairly well ascertained. The Moos case is certainly not authority for approving a petition which is based upon such instruments as those here involved, and which instruments create a jumble of confusion, uncertainty and ambiguity as to the rights and liabilities of the parties, and which are designed to prey upon the farmers and landowners of this state. In *Ward v. Home Royalty Ass'n*, 142 Kan. 546, 50 P. 2d 992, reference was made to the Moos case as follows:

"In the Moos case the association was a corporation with an apparently sound capital structure. Some of the results of operation were frankly disclosed, and the court declined to assume fraud would be practiced. *The court did not foresee the extent to which such schemes would be promoted in Kansas, and did not take into account the practical helplessness of a Kansas farmer if compelled to resort to litigation to correct abuses in corporate or trust management.*" (p. 549.) (Emphasis supplied.)

Incidentally, the above reference to the Ward case, and a distinction between the Moos case and the instant case, were made in the former opinion (163 Kan. 540, 551-553) in which all the members of this court concurred.

The Moos case is clearly distinguishable from the case at bar, but I can frankly state that should it not be so, the Moos case should be overruled.

It cannot be said here that this case must be affirmed in order to protect "innocent purchasers for value." The petition before us alleges that Central Royalty Company paid the trustee for Pool I, $250 for its rights acquired under Exhibit A; that Sinclair Prairie Oil Company paid Central Royalty Company $900 for assignment of the same rights as to Exhibit A only. Incidentally Exhibit A expired by its terms on April 24, 1948. No rights were acquired under Exhibit B by Central Royalty. The only right Sinclair Prairie acquired under Exhibit B were by Exhibit F dated February 16, 1942, for a consideration of one dollar. It should be noted that Sinclair was to acquire these rights under Exhibit F *"without the intervention and free from all claims of Lessor, Lessee, such pool members and/or such Trustees."* Sinclair must have anticipated claims by such persons. Exhibit B is the only instrument in existence under which Sinclair Prairie could claim any right—and the consideration

paid therefor was one dollar. Sinclair Prairie Oil Company was charged with knowledge of all the terms, conditions and infirmities apparent on the face of these recorded instruments—and was not an innocent purchaser for any substantial value.

I have touched upon the fact that Exhibits A and B are so ambiguous and uncertain that there could have been no meeting of the minds of the parties. Pages could be added to this already too lengthy dissenting opinion in making references to such ambiguities. This, too, is a matter considered by this court and discussed in the former opinion (163 Kan. 540, 549-550) which had the concurrence of a unanimous court. The second amended petition now before us contains no allegation which tends to clarify the rights and liabilities of the parties under these Exhibits A and B. Neither is there any allegation which alters the interpretation previously placed upon these instruments by the unanimous decision of this court. There is no reason for a different decision in this case now than was previously rendered. In all fairness, equity, justice and logic, the case should be reversed with directions to sustain defendant's demurrer to plaintiff's second amended petition.

HARVEY, C. J., and SMITH, J., concur in the foregoing dissent.